STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
STEVEN RAYMOND DAVIS,
DEFENDANT-APPELLANT.

Argued January 3, 1989—Decided August 3, 1989.

*Tina R. Boyer,* Assistant Deputy Public Defender, and *Lois De Julio,* First Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Cathleen Russo Delanoy,* Deputy Attorney General, argued the cause for respondent (*Cary Edwards,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, Justice.

In *State v. Biegenwald,* 106 *N.J.* 13 (1987), and *State v. Ramseur,* 106 *N.J.* 123 (1987), we determined the constitutionality of New Jersey's capital punishment act, *N.J.S.A.* 2C:11–3, and established standards for its application. In this case, tried before those decisions, the jury charge failed to comply with the *Biegenwald* requirement that to impose the death penalty the jury must be convinced beyond a reasonable doubt that the

statutory aggravating factors of *N.J.S.A.* 2C:11–3 outweigh the mitigating factors. The charge here would have permitted imposition of capital punishment on a finding that the aggravating and mitigating factors balanced. Therefore, the State agrees that a retrial of the penalty phase is required.

This case differs from other capital cases that we have decided since *Ramseur* and *Biegenwald* in that the defendant pled guilty to murder. Hence, we address certain evidentiary issues concerning the penalty phase that may arise in the event of a capital retrial. In addition, we address the question of the standard for measuring effective assistance of counsel in the original proceedings and its relevance to any resentencing. Finally, we furnish guidance to the trial court in connection with the application of *State v. Gerald,* 113 *N.J.* 40 (1988), to a capital retrial.

I

The case arises from the brutal killing of a twenty-three-year-old woman acquaintance of the defendant. For purposes of this appeal, we accept the factual version set forth in the defendant's brief and his recital of the procedural history.

On the morning of Monday, January 17, 1983, a worried next-door neighbor in Barbara Blomberg's two-family duplex house in Buena, New Jersey, entered Barbara's apartment via the common cellar access. She found Barbara's body lying across her bed on her stomach, nude from the waist down. Her body was mutilated and bloodied. Around her neck was an electrical cord. Strewn on the floor was a blue pouch containing a certificate of title to a Vineland house trailer that she had sold to the defendant, Steven Davis.

A tip led police to arrest the defendant on Wednesday, January 19, 1983. He was arrested with a .357 Magnum revolver, a shotgun, and fifty-six shells of ammunition in his possession. The police confronted him with information they had received that he had killed the victim. Within hours he

confessed to the murder. His confession and later testimony at the sentencing phase recount the events.

Through his friend, Mike Muccio, Davis had come to know Barbara. In Davis' words, he and Barbara were "real close" and he considered her "like a sister." Barbara was Mike's girlfriend, and they often double-dated with Davis. Although Davis lived in Pennsylvania, he had a child in the Buena area. Davis spent weekends in a Vineland house-trailer, which he had purchased from Barbara, so that he could visit with his son. At the time of the murder, Davis still owed $1500 of the $6000 purchase price, which he had been paying off over time.

He offered no explanation why he had gone to her apartment on that Sunday night. He had been drinking very heavily with friends on that day and admitted calling Barbara from the Bootlegger Bar in Buena. After the bar had closed at 2:15 a.m., he described himself as having become lost on the way to another party. Instead, he went to Barbara's home. When she did not answer the doorbell, he went back to his car and got a screwdriver and jimmied the door open. He took an appliance cord from an electric coffee pot in the kitchen and went upstairs to her bedroom. He heard her ask, "[w]ho is it?". He killed her by strangling her with the electric cord. He then stabbed and mutilated her body with a screwdriver and a knife. Davis then took from a blue pouch a paper that recorded his payment of debt, but left behind the bill of sale for the trailer. He also admitted stealing some articles of jewelry from the victim's apartment.

Afterwards, Davis went to Muccio's home and told him, "I think I killed somebody." Muccio, who was a sheriff's deputy, did not, however, report him immediately to the police, nor did Davis turn himself in that night. Davis' girlfriend, with whom he lived, testified that Davis knew that he "really had hurt [Barbara] and he wasn't sure how bad or what had really happened." Nonetheless, on Monday morning, in an apparent attempt to deny knowledge of her death, he called one of

Barbara's friends asking about her. He also called Muccio to arrange to go with him to Barbara's funeral scheduled for Wednesday. After driving to Vineland Wednesday morning, Davis telephoned Muccio. Muccio admitted to Davis that he had told the police that Davis murdered Barbara. While Davis was packing his car to leave his Vineland trailer, he was arrested. He had a .357 Magnum revolver, a shotgun, and ammunition.

Defendant was indicted for capital murder, burglary, possession of a weapon for an unlawful purpose, unlawful possession of a revolver, and other weapons offenses. In September 1983, defendant pled guilty to murder, felony murder, burglary, and possession of a knife for an unlawful purpose. The remaining counts were left open.

An interlocutory proceeding that resolved the use of expert testimony concerning the potential for rehabilitation of the defendant, *see State v. Davis*, 96 *N.J.* 611 (1984) (*per curiam*), delayed the penalty trial, which commenced on April 17, 1985. The State sought to prove two aggravating factors: that the murder was outrageously or wantonly vile, *N.J.S.A.* 2C:11–3c(4)c, and that it was committed during the course of a burglary. *N.J.S.A.* 2C:11–3c(4)g. [Hereinafter we refer to the subsections of *N.J.S.A.* 2C:11–3 as, for example, "c(4)g."] With regard to c(4)g, the State argued that the defendant went to Barbara's house with the purpose of stealing title to the house-trailer for which he owed Barbara money. With regard to c(4)g, the county medical examiner established that the cause of death was strangulation, and he estimated the time of death at about 2:30 a.m. on January 17. He also noted two blunt force injuries to the head, which could have produced severe pain and unconsciousness. He found multiple stab wounds, abrasions, and lacerations made on her body. He thought these were inflicted after death and could have been inflicted several hours later. The stab wounds he attributed to one weapon: a three and one-half-inch, single-edge knife. The abrasions, he thought, were caused by a screwdriver. A pattern of multiple

laceration wounds were found on Barbara's left forearm and left calf. One laceration wound was found slicing between her buttocks and through her anus.

Defendant testified in his own behalf, asserting that on the night of the murder he had been drinking heavily and using drugs. He claimed to have had no realization of what he had done. According to defendant, that night he had drunk several beers and shots, taken two quaaludes, and injected himself with methamphetamine, a stimulant commonly called "speed" or "crank." He acknowledged the murder as being senseless. It was like "[s]omething weird": "It was like it was somebody else" who was doing it. He denied any sexual motivation for the crime or any revenge based on the trailer-payment arrangements. He offered expert testimony with respect to mitigating factor c(5)h, that it would be unlikely that he would ever commit another serious offense. A psychiatric witness on his behalf concluded that based on defendant's consumption of alcohol, quaaludes, and methamphetamine, his ability to exercise normal behavior control was substantially impaired, a mitigating factor under c(5)d. He was, in his doctor's expert opinion, an alcoholic and a drug abuser. The expert said that Davis had expressed feelings of remorse and guilt over the death of Barbara. He also thought defendant could be rehabilitated.

Davis' father described his son as having a close relationship with Barbara. The entire Davis family viewed her as a friend. She often visited the family home. He saw his son as subject to drug- and alcohol-abuse problems, but was unable to help him overcome them. He could not explain why his son would kill someone who had been so kind to him and had done so many nice things for him and his family. Friends and family were unable to explain the murder. A religious counsellor cited Davis' repeated expressions of sorrow for the crime.

The State countered with expert testimony to the effect that his complex actions and his sophisticated "goal-seeking" allayed

any possibility of any sufficient degree of intoxication. The prosecution also presented Dr. Robert L. Sadoff, who concluded that defendant had "cognitive or intellectual awareness of what was going on about him and acted * * * with goal oriented behavior." He found emotional difficulties but no mental disease. The State rebutted some of the mitigating circumstances through other factual testimony.

The jury found that the State had proven both alleged aggravating factors. They also found that two mitigating circumstances had been shown by the defense; that the defendant had no significant history of prior criminal activity; and that other factors relevant to the defendant's character and to the offense served in mitigation. *N.J.S.A.* 2C:11–3c(5)h. The jurors concluded that the mitigating factors did not outweigh the aggravating factors, and sentenced Steven Davis to death. (The jury charge did not require the jury to determine whether the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.) He was sentenced on the non-capital counts to an aggregate term of life with a mandatory period of parole ineligibility of thirty years. He appeals to us under Rule 2:2–1(a)3.

Defendant has raised various constitutional and other challenges to his conviction. Issues similar to those raised in *Ramseur* and *Biegenwald* and other capital decisions of ours will not be extensively discussed but will be noted for completeness of the record and preserved by discussion, Part III, *infra* at 375. Here, we will discuss the major challenges specific to his penalty hearing.

## II

### A.

Should the Court adopt a higher standard than the *Strickland* standard of reasonable competence for counsel in capital cases?

## 1.

In *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), the Supreme Court set forth the constitutional threshold for vindication of the sixth amendment's guarantee to every citizen of the assistance of counsel in the defense of all criminal prosecutions. This constitutional guarantee of counsel "cannot be satisfied by mere formal appointment." *Avery v. Alabama,* 308 *U.S.* 444, 446, 60 *S.Ct.* 321, 84 *L.Ed.* 377, 379 (1940). "An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland, supra,* 466 *U.S.* at 685, 104 *S.Ct.* at 2063, 80 *L.Ed.*2d at 692. In other words, "the right to counsel is the right to the effective assistance of counsel." *Id.* at 686, 104 *S.Ct.* at 2063, 80 *L.Ed.*2d at 692 (quoting *McMann v. Richardson,* 397 *U.S.* 759, 771 n. 14, 90 *S.Ct.* 1441, 1449 n. 14, 25 *L.Ed.*2d 763, 773 n. 14 (1970)).

Ineffective assistance of counsel arises in the situation in which counsel fails to provide "adequate legal assistance." *Ibid.* (quoting *Cuyler v. Sullivan,* 446 *U.S.* 335, 344, 100 *S.Ct.* 1708, 1716, 64 *L.Ed.*2d 333, 344 (1980)). Adequate assistance of an attorney is measured according to whether the counsel has professional skills comparable to other practitioners in the field. This has been equated with a standard of "reasonable competence." *See State v. Fritz,* 105 *N.J.* 42, 53 (1987) (citing *Trapnell v. United States,* 725 *F.*2d 149, 151–52 (2d Cir.1983)); *see also McMann v. Richardson, supra,* 397 *U.S.* at 770, 90 *S.Ct.* at 1448, 25 *L.Ed.*2d at 773 ("reasonably competent advice"). "Reasonable competence" does not require the best of attorneys, but certainly not one so ineffective as to make the idea of a fair trial meaningless.

Hence, the Supreme Court has developed a two-prong test for determining whether counsel's assistance was so defective as to require reversal of a conviction. *See Strickland, supra,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674. This test

recognizes that when the level of counsel's participation makes the idea of a fair trial a nullity, no prejudice need be shown. It is presumed. *See United States v. Cronic*, 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984) (decided the same day as *Strickland*). An example of the *Cronic* presumption would be a failure by counsel for the defendant to cross-examine a key prosecution witness. *See Cronic, supra*, 466 *U.S.* at 659, 104 *S.Ct.* at 2047, 80 *L.Ed.*2d at 668. To establish this category of ineffective assistance, defendant is not required to show prejudice. That degree of deficient performance is tantamount to a "complete denial of counsel." *Id.* at 659, 104 *S.Ct.* at 2047, 80 *L.Ed.*2d at 668.

On the other hand, under *Strickland* if counsel's representation merely falls below the standard of reasonable competence, a reversal is required only if the Court finds prejudice to the defendant. In the context of a capital sentence, the defendant must demonstrate "a reasonable probability that, absent the errors, the sentencer * * * would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland, supra*, 466 *U.S.* at 695, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 698. Thus, in *Burger v. Kemp*, 483 *U.S.* 776, 793–95, 107 *S.Ct.* 3114, 3125–26, 97 *L.Ed.*2d 638, 657 (1987), although observing that counsel did not investigate evidentiary material to be presented in mitigation of defendant's sentencing phase, the Court did not invalidate the conviction because it was a strategic decision "supported by reasonable professional judgment" that such investigation "would not have minimized the risk of the death penalty." The Court rejected the argument that a more aggressive defense performance would have made a difference in the face of overwhelming evidence of defendant's guilt.

In *State v. Fritz, supra*, we adopted the *Strickland* standard as a matter of our own jurisprudence, although we phrased the prejudice test somewhat differently. Justice Handler, speaking for the Court, said:

Even if we are not constitutionally compelled to adopt the *Strickland–Cronic* test, the development of the law in this area impels us to conclude that we should recognize the soundness and efficacy of both the substance and formulation of this federal Constitutional standard in defining our own State Constitutional guarantee of effective assistance of counsel. We therefore hold that under Article I, paragraph 10 of the State Constitution a criminal defendant is entitled to the assistance of reasonably competent counsel, and that if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated. [105 *N.J.* at 58.]

Obviously, the defendant's guilt is not the measure of the constitutional guarantee. Were it so, *"Gideon's* promise"[1] would have extended only to defendants who could show that a lawyer would have made a difference. Rather, the measure of the constitutional guarantee is the fairness of the proceeding— the measure of its adversarial balance.

Courts reviewing death sentences generally focus on the procedures by which the sentence was imposed, rather than the result of the process, in the hope of assuring reliability and avoiding arbitrariness.

In ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty. [Fong, "Ineffective Assistance of Counsel at Capital Sentencing," 39 *Stan.L.Rev.* 461, 490 n. 177 (1987) (quoting *California v. Ramos,* 463 *U.S.* 992, 999, 103 *S.Ct.* 3446, 3452, 77 *L.Ed.2d* 1171, 1179 (1983)).]

### 2.

Is this standard sufficient for capital cases? In capital cases, reasonable competence is no small measure. "Today capital punishment has emerged as a major branch of constitutional jurisprudence, encompassing questions regarding the right to jury trial, cruel and unusual punishment, and procedural and substantive due process." Schnapper, Book Review, 84 *Mich.L.*

---

[1]Berger, "The Supreme Court and Defense Counsel: Old Roads, New Paths—A Dead End?", 86 *Colum.L.Rev.* 9, 61 (1986) (referring to *Gideon v. Wainwright,* 372 *U.S.* 335, 83 *S.Ct.* 792, 9 *L.Ed.2d* 799 (1963), which extended the sixth amendment's right to counsel to state criminal trials).

*Rev.* 715, 715 (1986) (reviewing W. White, *Life in the Balance: Procedural Safeguards in Capital Cases* (1984)).

Capital cases present an extraordinary challenge to courts and counsel. The Supreme Court has developed a highly complex body of law to effectuate the eighth-amendment guarantee that in order to avoid the arbitrariness that would violate the prohibition against cruel and unusual punishment, capital-punishment sentencing schemes must not result in death sentences that are "wantonly and * * * freakishly imposed" and "are cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman v. Georgia,* 408 *U.S.* 238, 309–10, 92 *S.Ct.* 2726, 2762, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring). Justice Thurgood Marshall has observed that "[d]eath penalty litigation has become a specialized field of practice, and even the most well intentioned attorneys often are unable to recognize, preserve, and defend their client's rights. Often trial counsel simply are unfamiliar with the special rules that apply in capital cases." Marshall, "Remarks on the Death Penalty Made at the Judicial Conference of the Second Circuit," 86 *Colum.L.Rev.* 1, 1 (1986).

Our decisions interpreting federal constitutional doctrine and our own constitutional doctrine as each applies to our death-penalty statute have occasioned in New Jersey a substantial body of capital precedent. In addition, our capital cases have generated an intensive examination by counsel of all aspects of criminal practice. *See State v. Williams,* 113 *N.J.* 393 (1988) (empanelment of the jury and its *voir dire* ); *State v. Moore,* 113 *N.J.* 239 (1988) (responsibility of courts to charge the jury with appropriate lesser-included offenses); *State v. Gerald, supra,* 113 *N.J.* 40 (1988) (responsibility of juries to determine that the defendant had the knowledge or purpose that death would result from the criminal act); *State v. Rose,* 112 *N.J.* 454 (1988) (necessity that juries understand the limited purposes that some evidence may have in capital cases); *State v. Zola,* 112 *N.J.* 384 (1988) (use of expert scientific evidence in capital cases); *State v. Bey,* 112 *N.J.* 123 (1988) [hereinafter *Bey II* ]

(non-unanimous jury verdict on the existence of mitigating factors); *State v. Ramseur, supra,* 106 *N.J.* 123 (1987) (resolution of basic constitutional issues and other pretrial issues including death-qualification and selection of grand and petit jury panels); *State v. Williams,* 93 *N.J.* 39 (1983) (problems of pretrial and mid-trial publicity).

The defendant, through the Public Defender, urges us to reevaluate our holding in *Fritz* and to adopt a test for measuring ineffective assistance of counsel under the State Constitution that will provide greater protections to capital defendants and improve the quality of representation. In particular, he objects to two features of the *Strickland* test: the presumption of competence under the first prong, and the requirement that the defendant must establish prejudice under the second prong. He argues:

> Death is too final and too drastic a penalty to be meted out when it is uncertain whether a defendant is receiving the sentence only because of the unprovable consequences of his admittedly incompetent representation.

> \* \* \* \* \* \* \* \*

> An appellate court's determination that a defendant is clearly guilty simply cannot be a substitute for a trial that has failed to establish guilt through fair procedures where life is at stake.

We recognize, as Justice Handler did in his dissent in *State v. Ramseur, supra,* 106 *N.J.* at 364 n. 12, that although we "adopted the general principles of *Strickland* in *State v. Fritz,*" we had "no occasion to decide, however, the applicability of those standards in the special context of capital punishment." The Court is cognizant of the suggestion that it should develop higher standards for appellate review of constitutional-rights claims in capital cases. We recognize that because of their finality, capital cases are "a categorical imperative for trial fairness." *State v. Williams, supra,* 93 *N.J.* at 61. One of the pillars on which the Supreme Court has rested the constitutionality of state capital-sentencing procedures is that of "meaningful appellate review." *Gregg v. Georgia,* 428 *U.S.* 153, 195, 96 *S.Ct.* 2909, 2935, 49 *L.Ed.*2d 859, 887 (1976).

Nonetheless, we do not feel impelled to adopt stricter standards for judging constitutional rights in capital cases than in noncapital cases. To judge capital defendants differently would effectively diminish the rights of noncapital defendants, a disquieting result that we reject. There either is a constitutional violation or there is not. There can be no double standards. At the same time, we have committed ourselves to a searching and stringent review of capital records, which, we believe, coupled with an enhanced application of the harmless error standard, would be "sufficiently flexible to accommodate our heightened concerns and responsibilities in reviewing death-penalty prosecutions." *State v. Bey*, 112 *N.J.* 45, 95 (1988) [hereinafter *Bey I*].

We see no need, then, to alter the *Strickland/Fritz* standard for capital cases. Capital defendants are guaranteed competent capital counsel. Obviously the measure of an advocate's competency depends on the task to be accomplished. The best intentions and the most devoted of efforts do not necessarily equate with capital competence. We expect capital defense counsel to have an expertise regarding the special considerations present in capital cases. The *Strickland/Fritz* standard demands no less. A sample of post-*Strickland* capital cases sets forth factors that evidence a lack of competence in capital cases: *Tyler v. Kemp*, 755 *F.*2d 741 (11th Cir.) (inexperienced counsel failed to investigate and offer mitigating evidence), *cert. denied*, 474 *U.S.* 1026, 106 *S.Ct.* 582, 88 *L.Ed.*2d 564 (1985), *overruled on other grounds, Peek v. Kemp*, 784 *F.*2d 1479 (11th Cir.), *cert. denied*, 479 *U.S.* 939, 107 *S.Ct.* 421, 93 *L.Ed.*2d 371 (1986); *Blake v. Kemp*, 758 *F.*2d 523 (11th Cir.) (failure to make any preparation for penalty phase), *cert. denied*, 474 *U.S.* 998, 106 *S.Ct.* 374, 88 *L.Ed.*2d 367 (1985); *Jones v. Thigpen*, 788 *F.*2d 1101 (5th Cir.1986) (presented no defense at sentencing phase), *cert. denied*, 479 *U.S.* 1087, 107 *S.Ct.* 1292, 94 *L.Ed.*2d 148 (1987); *see also* Fong, *supra*, 39 *Stan.L. Rev.* at 470–75. These particularly egregious examples are not intended to be the bench marks of capital-case incompetence,

but rather are examples of incompetence. We are satisfied that the *Strickland* measure of the effectiveness of counsel, considered with the test of whether "these deficiencies materially contributed to defendant's conviction," *Fritz, supra,* 105 *N.J.* at 58, will adequately fulfill the constitutional guarantee.

## B.

Did defense counsel fail to meet the *Strickland* standard by not moving to suppress defendant's confession and permitting him to plead guilty to murder?

Preliminarily, we note that the question of the prejudicial effect of any lack of competence is mixed in this case with the question of trial strategy chosen by counsel. Hence, we shall address the two in relationship to each other. Every member of the Supreme Court agrees that "[i]n assessing the adequacy of counsel's performance, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Burger v. Kemp, supra,* 483 *U.S.* at 819, 107 *S.Ct.* 3114, 3138–39, 97 *L.Ed.*2d at 673 (Powell, J., dissenting) (quoting *Strickland, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). But "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland, supra,* 466 *U.S.* at 690–91, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. Thus, an inadequate investigation of law or fact robs a strategic choice of any presumption of competence. With respect to the legal decisions made by defense counsel, we are satisfied that if the attorney's performance had been deficient, satisfying *Strickland's* first prong, it would have created "a reasonable probability that these deficiencies materially contributed to defendant's conviction," *Fritz, supra,* 105 *N.J.* at 58, thus satisfying *Strickland's* second prong.

But the difficulty we have with the first prong of the *Strickland* test is that the defendant has made no showing that trial counsel failed to investigate any reliable sources of evi-

dence or misconstrued or misunderstood the law with respect to the issues. Unlike the attorney in *Kimmelman v. Morrison,* 477 *U.S.* 365, 106 *S.Ct.* 2574, 91 *L.Ed.*2d 305 (1986), who for lack of investigation failed to suppress the confession, here counsel, on the basis of trial strategy, chose not to move to suppress the confession. In part, this may have stemmed from his view that given the other overwhelming evidence of guilt (defendant's statements to Muccio and to his girlfriend), it would be better to present defendant to a sentencing court as one who had made a clean breast of it.

Moreover, we are unable to perceive any misjudgment with regard to the admissibility of the confession. Appellate counsel pointed to evidence of defendant's substance-dependency and his condition on the date of his arrest as evidencing the involuntariness of the confession. Yet in similar circumstances, confessions have been held voluntary and the "product of a rational intellect and a free will," not overborne from the influence of drugs and alcohol. *See, e.g., Boggs v. Commonwealth,* 229 *Va.* 501, 512, 331 *S.E.*2d 407, 415–16 (1985) (quoting *Yarborough v. Commonwealth,* 217 *Va.* 971, 974, 234 *S.E.*2d 286, 289 (1977) (quoting *Townsend v. Sain,* 372 *U.S.* 293, 307, 83 *S.Ct.* 745, 754, 9 *L.Ed.*2d 770, 782 (1963))) (confession to capital murder held voluntary when night before confession defendant consumed alcohol, smoked marijuana and took amphetamines), *cert. denied,* 475 *U.S.* 1031, 106 *S.Ct.* 1240, 89 *L.Ed.*2d 347 (1986). Moreover, the surrounding circumstances completely belie any lack of competence or inability to appreciate or understand the nature and quality of his act of confession. *See Bey II, supra,* 112 *N.J.* 123. The only evidence of the defendant's incompetency was the testimony of one witness who said that the defendant had "glassy eyes" at the time of his confession. Here, we are unable to say that trial counsel's decision not to attempt to suppress the confession was not reasonably competent or the result of inadequate investigation or preparation.

Whether the decision to plead defendant guilty fell outside that latitude of judgment is a debatable question. Some lawyers believe it best to plead guilty to nothing. Others believe that an absurd defense can inflame a jury. Perhaps the most telling argument against this decision is "what did he get for it?". Indeed, nothing. But the counterpoint is what might he have gotten?

So brutal and so senseless was this murder, bereft even of the excuse of panic, that reasonably competent counsel might have made the choice. *See State v. Rose, supra,* 112 *N.J.* 454 (defendant alleged he shot police officer out of panic and fear).

> Public attention tends to become focused on the dramatic aspects of the lawyer's work during a trial, but it is axiomatic among trial lawyers and judges that cases are not won in the courtroom but by the long hours of laborious investigation and careful preparation and study of legal points which precede the trial. [ABA Standards Relating to the Defense Function (Pt. IV) Introductory Note at 224 (1971).]

An argument is made that the decision to plead guilty should have been premised on a conclusion that the sentencing jury would be presented with reliable facts, supported by steadfast opinions by psychiatric experts, showing that defendant's conduct was aberrational and he was remorseful. No such picture was presented in this case. But defense counsel was hampered in his efforts by the death of a retained expert before trial. Problems with defense experts continued when the defendant's psychiatric expert wavered in his opinion on learning during cross-examination that Davis was arrested with a pistol, shotgun, and fifty-six rounds of ammunition in his possession.

Defendant's counsel, however, was fierce in his tenacity and steadfast in his devotion to his client's cause. Although privately retained, he soon exhausted the received retainer. Recall that he appealed to this Court after the trial court refused his proffer of evidence asserting the capacity for rehabilitation as a mitigating factor. *State v. Davis, supra,* 96 *N.J.* 611. Even after his retainer was exhausted, he was required to continue the defense. (Trial counsel, in fact, moved to be relieved. The motion was denied, but trial counsel was granted

leave to petition the State to have expert witnesses' fees paid.) He did not waver in his resolve or efforts. His efforts to exclude evidence met with sometimes harsh confrontations with the trial court and his objections were often overruled.

We examine these trial transcripts acknowledging that hindsight makes experts of us all. But defense counsel was not aided by defendant's partial disclosures of evidence. Under withering cross-examination, defendant was forced to admit a trail of deception in his pretrial statements to the police. It was not until Davis took the stand that he admitted that he had called Barbara from the Bootlegger Bar on the night of the murder and that she refused to go along with his request to turn over to him the title to the trailer. The prosecution hammered away at what it portrayed as a series of untruths: his false remorse as shown by the call to Barbara's girlfriend; his concealment of the fact that he had taken a gun to the murder scene; his denial that the lights were on when he killed Barbara; and his willingness to implicate Muccio if it would get him out of jail. These searing inconsistencies, more than any strategic decision of counsel, hampered the strategy.

In sum, the decision not to move to suppress the confession was a reasonable one. The circumstances of this case do not occasion any second-guessing whether defendant was inadequately served by a decision to plead guilty. Any question about the reasonableness of the decision to plead guilty and expose defendant only to the penalty phase is mooted because the plea did not establish death eligibility under the standards of *State v. Gerald, supra,* 113 *N.J.* 40. *See infra,* pt. E at 366.

## C.

Did the trial court err in admitting evidence of defendant's statement to an investigator whom he may have assumed to have been sent by an attorney acting in his behalf?

We have before us the question of whether the prosecution's use of a certain statement made by the defendant to an investigator violated the attorney-client privilege. The prosecutor had introduced at trial defendant's statement to an investigator to impeach the credibility of a defense witness. While defendant was awaiting trial, Mr. Blomberg, the victim's father, had hired independent counsel, Robert Bailey, and a private investigator, James Gardner, to investigate the involvement of Michael Muccio in the murder of his daughter. Trial counsel related that Mr. Blomberg had been visiting Davis regularly in jail and allegedly told Davis that if he implicated Muccio in the murder, · Davis would be "out of jail by Christmas." When Davis' trial counsel learned of Mr. Blomberg's activity in the case, he sought leave for and was granted a withdrawal from the case. Davis then spoke with the investigator, recanted his prior confession, and stated that it was really Muccio who had murdered Barbara. Almost immediately, Davis called Gardner and repudiated his statement, stating that he lied because Mr. Blomberg asserted that by saying what he did he would be released. Davis then severed any relationship he had with Bailey and asked trial counsel to resume his representation.

In New Jersey, the privilege regarding confidential communications between an attorney and client "extends to the necessary intermediaries and agents through whom the communications are made." *State v. Kociolek*, 23 *N.J.* 400, 413 (1957). We have long recognized that a client's privileged communications are "permanently protected from disclosure by himself, or by the legal advisor, or by the agent of either confidentially used to transmit the communications * * *." *State v. Loponio*, 85 *N.J.L.* 357, 360 (E. & A.1913). This privilege has been held to include confidential communications to private investigators acting on behalf of counsel for the defendant. *Delap v. State*, 440 *So.*2d 1242 (Fla.1983), *cert. denied*, 467 *U.S.* 1264, 104 *S.Ct.* 3559, 82 *L.Ed.*2d 860 (1984); *People v. Knippenberg*, 66 *Ill.*2d 276, 6 *Ill.Dec.* 46, 362 *N.E.*2d 681 (1977); *State v. Tapia*, 113 *N.J.Super.* 322 (App.Div.1971); *Commonwealth v.*

*Hutchinson,* 290 *Pa.Super.* 254, 434 *A.*2d 740 (1981). The investigator, who may act as an agent of either the defendant or his counsel, renders services on behalf of the defendant.

Although the record is unclear concerning the nature of the relationship established between Davis and Bailey (or for that matter, Bailey and the investigator), the record suggests that Davis was making a statement to Gardner to be utilized as a part of his defense. When trial counsel sought to be relieved, he stated that he had spoken with both Davis and Bailey, and learned that defendant decided to retain new counsel. (In fact, at the motion to withdraw as counsel, trial counsel stated that it was defendant's father who retained new counsel because of the cost of representation and a disagreement about trial defense strategy.) Although Bailey was never formally substituted as counsel, the statements made to Gardner would be within the bounds of legal counseling and be considered privileged if either Bailey was undertaking Davis' defense or if Davis reasonably believed he was. *Cf. State v. Tapia, supra,* 113 *N.J.Super.* 322 (statements made by defendant under mistaken belief investigator was agent of own attorney held to be privileged as an attorney-client communication); *State v. Loponio, supra,* 85 *N.J.L.* at 363 (letter written by third party for inmate who seeks to retain counsel held protected by attorney-client privilege). We note that the record is far from clear concerning Davis' own understanding of his relationship with Bailey. At one point, Davis acknowledged that he did not have a lawyer after trial counsel withdrew.

The waiver of the attorney-client privilege rests solely with the client, not counsel; an attorney or agent may exercise this power only acting with a client's authority. 8 J. Wigmore, *Evidence on Trials at Common Law,* §§ 2321, 2327 (McNaughton rev. 1961). This privilege continues, despite the termination of the attorney-client relationship. *Commonwealth v. Hutchinson, supra,* 290 *Pa.Super.* at 262–63, 434 *A.*2d at 744–45; 8 J. Wigmore, *supra,* at § 2323. There is no

suggestion that Davis authorized any waiver. Regardless of how the prosecution received such privileged materials, "it may not use them as substantive evidence or for impeachment of defendant in trial." *People v. Shiflet,* 125 *Ill.App.*3d 161, 171, 465 *N.E.*2d 942, 949 (1984). This evidence was first used to test the reliability of defendant's experts' belief that the defendant was remorseful. The evidence showed the defendant to be devious, if not totally a liar. Defendant's trial counsel then felt compelled to spread the whole story on the record and before the jury. It was plainly damaging testimony and could not be considered harmless.

On remand, the factual issue of the extent of the relationship between Bailey and Davis must be resolved. The trial proceedings should also reveal what representations were made to Davis by Gardner or others. Should a privileged relationship be found to exist, the application of the "crime or fraud" exception to the privilege may be tested in light of that record. *In re Nackson,* 114 *N.J.* 527, 535–37 (1989).

### D.

Did the trial court err in permitting the State to offer rebuttal evidence of the victim's state of mind?

In this case, the defendant claims as error the admission over defendant's objection of certain testimony concerning a conversation that the witness had with the victim approximately a month prior to the murder. The witness testified that Ms. Blomberg

said she was very upset, very frustrated because he wasn't making his payments, and she didn't know what to do about it. She didn't want to take any legal action because he was a friend. She never had any legal papers drawn up and he wouldn't get in touch with her about it or speak to her about it. She didn't know how to get in touch with him. There was just a gap between them at that time.

The witness also testified that the victim appeared "nervous" and "upset" during the conversation.

Defendant argues that such testimony was hearsay not covered by any exception nor relevant to any issue at the penalty

phase. The State maintains the evidence, even if hearsay, was properly admitted under *Evid.R.* 63(12) as indicative of the victim's state of mind. Because this issue is likely to recur in a new penalty phase, we will address it briefly.

Regardless of whether any or all of such testimony constitutes hearsay under *Evid.R.* 63, any description of the victim's statements or demeanor is admissible only if her state of mind is in fact relevant. *Evid.R.* 63(12), although an exception to the hearsay exclusion, does not overcome the most basic rule that in order to be admissible, evidence must be relevant. *Rule* 63(12) in fact restates this basic relevancy rule as a prerequisite to its invocation as a hearsay exception:

A statement is admissible if it was made in good faith and it (a) described the declarant's then existing state of mind, emotion or physical sensation * * * *when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant* * * *. [*Evid.R.* 63(12) (emphasis added).]

Under the special circumstances of a capital sentencing hearing, the only aggravating factors that a jury shall consider are those set forth in the statute. *See State v. Rose, supra,* 112 *N.J.* at 507–08. In *Rose,* we emphasized the special responsibility that courts have to guarantee that extraneous factors do not influence the jury's capital sentencing disposition. *Id.* at 503–08. "The State, in the penalty phase, is restricted to proving the statutory aggravating factors and rebutting proof of mitigating factors." *Id.* at 503.

Thus, in this case, where the victim's state of mind was not relevant to any of the proposed aggravating factors, such testimony would be inadmissible as part of the prosecution's case-in-chief. This is particularly true in light of the fact that there was no evidence that the victim ever communicated her concerns to the defendant, a prerequisite to the use of such evidence to establish defendant's motive. *Cf. State v. Machado,* 111 *N.J.* 480, 489 (1988) ("Declarations of the victim's state of mind, however, should not be used to prove the defendant's motivation or conduct.").

In this case, however, the testimony was not offered as part of the prosecution's case-in-chief, but as rebuttal to the defendant's claim that he and the victim "were real close" and "never had an argument or disagreement." *Cf. id.* at 487 (evidence of victim's state of mind offered as part of case-in-chief). Moreover, the testimony in question did not imply in any way that the victim feared the defendant and therefore cannot be seen as unfairly prejudicial. *Cf. id.* at 489 ("When the victim's declarations do not express fear of the defendant, they might be admissible under an exception to the hearsay rule as a declaration of the victim's state of mind * * *.").

Because the relevance of the testimony in question depends on the strategies followed and evidence presented, we are unable to predict whether such evidence will be admissible at any future penalty phase. Although the nature of the defendant's relationship to the victim is not relevant to any of the aggravating factors, if the defendant places his relationship with the victim in issue, evidence bearing on the nature of the relationship may be relevant. "[W]e do not foreclose the possibility that some of the victim's statements may be admissible as background to establish the nature of the relationship between the victim and the defendant." *Ibid.* However, in the event such testimony is determined to be relevant, and not unfairly prejudicial, to the narrow issues in dispute at a capital-penalty hearing, the court should be careful to instruct the jury that the evidence of the victim's state of mind may not be considered as an aggravating factor in itself, but solely, and to a limited extent, as rebuttal background to the relationship. *See State v. Rose, supra,* 112 *N.J.* at 503–08.

In addition, inflammatory material should not be introduced into the case unless the party is prepared to demonstrate its admissibility. For example, during cross-examination the prosecutor presented the defendant with a parking receipt and asked him whether he had written the note that had been scribbled on the back. When the defendant replied that it was

not his handwriting, the prosecutor nonetheless asked him to read the note, which said "Barbara you were due, please pay or we will get you." The prosecutor then asked the defendant if he had left the threatening note in Barbara's car, to which defendant once again replied "No, that's not my handwriting." Although the ticket was not permitted to go to the jury, and the prosecutor did not in any way focus on this threat and did not use it in his closing argument, it is impossible to know what effect its introduction had on the jury. As such evidence was clearly of a prejudicial nature, it should not be referred to in any future trial or penalty phase unless some more substantial showing of relevance is established. In the absence of proof that the State can link defendant with the threat to the victim, such cross-examination should not be permitted. *See Rose, supra,* 112 *N.J.* at 500 (Cross-examination was improper where "no facts concerning the event on which the question was based were in evidence and the prosecutor made no proffer indicating his ability to prove the occurrence.")

Finally, even relevant evidence of an inflammatory nature may not be admitted under *Evid.R.* 4, regardless of the availability of limiting instruction, if probative, non-inflammatory evidence on the same point is available. *State v. Prudden,* 212 *N.J.Super.* 608, 614 (App.Div.1986); *see also Rose, supra,* 112 *N.J.* at 503–04 (when court in capital case is aware of the State's intent to cross-examine concerning inflammatory evidence of limited relevance, it should rule in advance, outside the jury's presence, on the scope of such cross-examination).

### E.

Did the defendant's plea to murder establish death-eligibility under *N.J.S.A.* 2C:11–3c?

Following oral argument, the parties briefed an issue that has arisen consequent to our decision in *State v. Gerald, supra,* 113 *N.J.* 40. In *Gerald* the Court traced the inclusion in 2C:11–3 of the pre-Code offense of second-degree murder death

arising from the intentional infliction of serious bodily injury on the victim, as a form of murder, but not capital murder. The Court is convinced, some members for differing reasons, that the Legislature never intended that capital sentencing be imposed on a defendant unless the defendant had the purpose or knowledge of a killer. *See id.* at 89–90. In order to establish death-eligibility, we required the jury to determine that the defendant had the knowledge or purpose to kill and not merely to inflict serious bodily injury that resulted in death. *Gerald, supra,* 113 *N.J.* at 69–91. The Court held that the contrary interpretation, that execution could result from an unintended homicide, would render the statute unconstitutional under New Jersey's prohibition against cruel and unusual punishment. *Id.* at 89. In order to conform with what we believe to be certain legislative intent and constitutional principle, the jury's verdict must establish that the accused had the knowledge or purpose to kill.

In this case, the defendant pled guilty to an indictment that alleged the crime of murder in violation of 2C:11–3. That indictment was similar to the one in *Gerald* insofar as it embodied two forms of murder, one capital and the other non-capital. There are two aspects then to the question: (1) was the plea entered with understanding of its consequences?; and (2) does the plea establish death eligibility?

 Generally, a person pleading to a charge must be made specifically aware of all of the penal consequences of the plea. *State v. Howard,* 110 *N.J.* 113 (1988) (prior to acceptance of guilty plea, defendant must be informed of the possibility of sentence to adult diagnostic and treatment center and parole consequences thereof); *State v. Kovack,* 91 *N.J.* 476 (1982) (prior to acceptance of a guilty plea, defendant must be informed of the possibility of parole ineligibility). In this case, there can be no doubt that defendant was aware that a sentence of death was a possibility.

▉ Nor does it appear from the record that misinformation directed to the defendant directly induced him to enter the plea, thus warranting that he be allowed to withdraw. *Cf. State v. Nichols,* 71 *N.J.* 358 (1976) (defendant allowed to withdraw his guilty plea where his counsel, the State, and the trial court misinformed him concerning a material element of his plea bargain). It is obvious from the plea transcript that the only information directed to defendant related to the strategic decision to plead guilty. Defendant was asked whether he realized that he was giving up his right to contest the charges:

You are giving up all these rights in exchange for what you might call a strategy to permit us to argue and to plead before the jury, a fresh jury, who has not heard your contesting the crimes that you have been charged with, contesting your guilt, to permit a fresh jury to hear, to understand that you have admitted these things forthrightly and that what you are doing now is to demonstrate to them why they should spare your life. Do you understand that?

Moreover, ordinarily "a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." *Brady v. United States,* 397 *U.S.* 742, 757, 90 *S.Ct.* 1463, 1473, 25 *L.Ed.*2d 747, 761 (1970); *see also United States v. Broce,* 488 *U.S.* ——, 109 *S.Ct.* 757, 102 *L.Ed.*2d 927 (1989) (double jeopardy claim could not be used to attack plea collaterally).

▉ But a strong argument can be made that a capital plea like a capital verdict must have been entered in contemplation of all available verdicts. *See State v. Moore, supra,* 113 *N.J.* 239 (capital defendant is entitled to have jury charged on lesser-included offenses). How can a plea be knowing if the defendant does not know the offense to which he is pleading? For a plea to be valid, "all material terms and relevant consequences [must] be clearly disclosed, *fully understood,* and knowingly and voluntarily accepted by the defendant." *State v. Warren,* 115 *N.J.* 433, 444 (1989) (emphasis added); *see State v. Taylor,* 80 *N.J.* 353, 362 (1979). Concededly, defendant was not aware of the distinction between the two forms of

murder embraced by 2C:11-3, and was not given to understand the consequences of the distinctions. Should he have "fully understood" the *Gerald* distinction? Of course, full understanding has not always been equated with foreknowledge of changes in the law that might take place, *supra* at 367, but we have held that

> with respect to the death penalty, and changes within only a three-year period that affect its imposition, it is both unjust, and probably outside of the Legislature's intent, *not* to give those previously tried the benefit of provisions intended to have been in the law in the first place. [*State v. Biegenwald, supra*, 106 *N.J.* at 66–67 (holding that defendant was entitled to charge that aggravating factors must outweigh mitigating factors beyond a reasonable doubt).]

To test whether another verdict should have been available, we might ask whether a court could have refused to submit the "serious bodily injury" form of murder to the jury. Given the normative role of the jury in capital cases and our insistence that juries consider all verdicts that have a "rational basis" in the evidence, *State v. Crisantos (Arriagas)*, 102 *N.J.* 265 (1986), a jury undoubtedly would have had to consider serious-bodily-injury murder as an available verdict. *Cf. State v. Hunt*, 115 *N.J.* 330 (1989) (failure to give a separate "serious bodily injury" charge was harmless error under the narrow circumstances of that case, in which the defendant was no longer eligible for the death penalty and would receive the same sentence even if he had been found guilty of the lesser "serious bodily injury" form of murder). We note that the argument loses strength in the face of the strategic purpose of this plea. He pled guilty assuming that, because of his admission of guilt, the sentencing jury would be more likely to find him remorseful, and thus less-deserving of a death sentence. Without commenting on the wisdom of that choice, it is not possible to foreclose the possibility that the strategic considerations would have been different if he had known of the other available verdict.

Beyond this aspect of the plea, the question that remains is: does the plea itself establish death-eligibility? The difficulty

with this case is not only in the defendant's awareness of the material terms and penal consequences of the plea, but also in the sufficiency of the plea itself. The plea establishes that the defendant is guilty of murder as charged in Count I of the indictment. That count charged defendant with "purposely or knowingly caus[ing] the death of *or serious bodily injury resulting in the death of* Barbara Blomberg." (Emphasis added). As *State v. Gerald* establishes, the second form of murder alleged in the indictment is non-capital murder.

Under *Rule* 3:9-2 a capital defendant pleading guilty is not required to supply a factual basis for the charge, although a sufficient factual basis is still a prerequisite to acceptance of the plea. Had the plea transcript specifically and unequivocally established that the defendant had either the knowledge or purpose to kill his victim, the case might be closed. However, the plea transcript reiterated the defendant's statements in his confession, and later in his trial testimony, that he did not "go in that apartment with the idea or intention to kill her," but he did "in fact * * * commit those acts."

The State argues with force that there is but one possible meaning to defendant's actions—that he had knowingly or purposely caused Barbara's death. The State points to the savage and deliberate nature of the attack: the premeditated placing of the electrical appliance cord about his neck as he mounted the stairs, the isolation of the victim by cutting the telephone wires, the deliberate mutilation of her body by countless slashings with the knife and screwdriver. All of these bespeak not an intention to inflict bodily harm but to kill.

It cannot be doubted that a jury could so find, and in some instances we have concluded that there was no possibility that the jury's verdict was premised on an intent to cause only bodily injury that resulted in death. In *State v. Pitts*, 116 *N.J.* 580 (1989), the Court examined the jury's verdict, the trial strategy of the defendant, and the evidence, and concluded that the verdict established with an abiding certainty that defendant

had intended death only, and that the jury had made that finding in the face of a plea that the defendant's rage should mitigate the offense.

A plea, however, is very different in both substance and procedure from a jury verdict. While a jury's guilty verdict will be upheld as long as there are sufficient facts from which a reasonable jury might conclude beyond a reasonable doubt that the defendant committed the act charged, *State v. Martinez*, 97 *N.J.* 567 (1984), in New Jersey a guilty plea to a non-capital charge cannot be accepted unless the defendant acknowledges his guilt. *R.*3:9–2; *see State v. Reali*, 26 *N.J.* 222 (1958); *State v. Sands*, 138 *N.J.Super.* 103 (App.Div.1975), *affirmed on other grounds*, 76 *N.J.* 127 (1978). Although *Rule* 3:9–2 waives the requirement that defendants charged with capital crimes supply the factual basis, that Rule is designed only to avoid forcing the defendant to say anything that might support an aggravating factor. Comment, Trial Judges Committee on Capital Causes, *reprinted in* S. Pressler, *Rules Governing the Courts of the State of New Jersey* 533 (1989). Furthermore, the Rule preserves the factual-basis requirement even though waiving the requirement that the defendant supply it. While the factual-basis requirement might be waivable where a defendant pleads guilty to a lesser-included offense in order to avoid the death penalty, *ibid.*, a factual basis for a capital conviction cannot be sufficient when defendant's statements in support of his plea contradict the required intent. The problem in this case is that although there may be sufficient facts available to support a finding that the defendant knowingly and purposefully murdered, his statements contradict any such finding.

This case may illustrate some need for revisions in the current format for accepting pleas in capital cases. The prior version of New Jersey's capital-punishment law permitted a defendant to avoid the death penalty by entering a *non vult* or *nolo contendere* plea to murder. *N.J.S.A.* 2A:113–3, *repealed*

by *L.*1978, *c.* 95, eff. Sept. 1, 1979. A *non vult* or *nolo contendere* plea did not require an admission of guilt. Alternatively, one convicted of first-degree murder was automatically sentenced to death unless the jury recommended mercy. *N.J. S.A.* 2A:113–4, *repealed* by *L.*1978, *c.* 95, eff. Sept. 1, 1979. This type of statute, which placed a heavy toll on the decision to contest one's guilt at trial, was declared unconstitutional by the Supreme Court in *United States v. Jackson,* 390 *U.S.* 570, 88 *S.Ct.* 1209, 20 *L.Ed.*2d 138 (1968), as violating the right to trial by jury. As a result, this Court invalidated the prior death-penalty statute and commuted all outstanding death sentences imposed under it. *State v. Funicello,* 60 *N.J.* 60 *cert. denied,* 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972).

When the current version of the death penalty was passed, the problem arose concerning how a defendant choosing to plead guilty could supply a factual basis for his plea, as required for all guilty pleas, without prejudicing his chances at the penalty phase. The Trial Judges Committee on Capital Causes proposed our current Rule, which is a variant on the ordinary non-capital plea procedure. As previously noted, a factual basis is required to be established, but it need not come from the defendant's admissions at the plea proceedings. *R.* 3:9–2. The anomaly that was carried forward from pre-*Jackson/Funicello* law, that a defendant need not admit or supply the factual basis for a capital plea, however, may be misplaced. The purpose of a *non vult* or *nolo contendere* plea was to enable the defendant to *avoid* exposure to the death penalty, not to simplify exposure to the death penalty.

 Obviously, a capital defendant should not be disadvantaged by a plea requirement that he or she furnish the factual basis for the plea. But trial courts must be assured that the plea distinctions to be made between capital and non-capital murder are adequately set forth in the plea record. Trial counsel should not be subjected to claims of ineffective assistance of counsel if these proceedings are restricted in scope.

At present, a defendant's statements in support of a non-capital guilty plea are inadmissible at trial only if the plea is refused by the court, *R.* 3:9–2, or if it is withdrawn after acceptance. *See State v. Boone,* 66 *N.J.* 38 (1974). No Rule or case addresses the question whether, under 2C:11–3, statements furnishing a factual basis for a capital guilty plea are admissible at the penalty phase. However, the current provision in *Rule* 3:9–2 permitting the capital defendant to plead guilty without furnishing statements in support of a factual basis was intended to avoid this problem. *See* Trial Judges Committee on Capital Causes, *supra.* In light of the requirements noted in establishing the basis for a capital plea, perhaps this Rule could be revised to require the defendant to supply the factual basis, but precluding the subsequent use of such statements at the penalty phase. We need also consider the use of such statements to attack the defendant's credibility. *Cf. New Jersey v. Portash,* 440 *U.S.* 450, 99 *S.Ct.* 1292, 59 *L.Ed.*2d 501 (1979) (defendant's compelled grand jury testimony cannot be used against the defendant at a subsequent trial even if only to impeach credibility); *Simmons v. United States,* 390 *U.S.* 377, 88 *S.Ct.* 967, 19 *L.Ed.*2d 1247 (1968) (statements made by defendant to support a suppression motion cannot be used at trial on the issue of guilt); *State v. Petrovich,* 125 *N.J.Super.* 147 (Law Div.1973) (prohibiting the use of defendant's suppression hearing testimony as substantive evidence of guilt, but allowing its use to attack defendant's credibility if it conflicts with defendant's testimony at the subsequent trial).

There are many subtle and complex issues that are to be resolved in fashioning a plea process tailored to capital cases. We shall refer the question to our Trial Judges Committee on Capital Causes for further consultation with prosecution and defense bars concerning any recommended amendments. In the meantime, trial courts must be assured that the plea distinctions to be made between capital and non-capital murder are adequately set forth in the plea record.

■ Although this defendant's statements at the plea hearing may not directly contradict a finding that he knowingly and purposely intended to kill, we cannot conclude that the plea here establishes that required intent. As noted, the defendant pled guilty as a strategic device. His plea does not establish more than that he pled guilty to a single indictment charging him with two alternative forms of murder, one capital and the other noncapital. The plea colloquy with the defendant was:

THE COURT: Mr. Davis, it has been indicated that you desire at this time to retract any former plea of not guilty and enter a plea of guilty to Counts One, Two, Three and Four of Indictment 4391–83B, is that correct?

THE WITNESS: Yes.

THE COURT: Do you understand that the First Count charges on or about January 17, 1983, in Buena Borough you did purposefully or knowingly cause the death of or *serious bodily injury resulting in the death* of Barbara Blomberg, and that you committed the homicidal act by your own conduct, *this being a charge of murder.* Do you understand that? [Emphasis added.]

As we now know, there was more than enough evidence to establish death eligibility under *Gerald,* but not all this evidence was part of the plea record. The most damaging evidence, the piercing cross-examination of defendant about having stabbed her aiming at the heart and liver, was not part of the plea record. (The plea record included defendant's confession and the autopsy report, not the statement to the police that was used to impeach defendant at trial.) The defendant was not informed of the level of intent required to establish death-eligibility. Although, by itself, this might not pose a problem if the defendant had admitted an intention to kill, see *supra* at 370, it is not possible, given the timing of the *Gerald* decision and the absence of a factual finding by the court accepting the plea, to distinguish what form of murder the plea established.

In *State v. Gerald,* we held that a jury verdict that did not distinguish between the two forms of murder could not establish death-eligibility. This plea does not distinguish between the two forms of murder. It does not establish death eligibility. On remand, further proceedings must conform to *State v. Gerald.* If the defendant does not plead to capital murder, the

"guilt phase of the capital murder charge must be retried from the beginning." *Gerald, supra,* 113 *N.J.* at 92.

### III

For completeness of the record and preservation of the issues, we note the points raised by the defendant that were decided in *Ramseur* and *Biegenwald,* specifically defendant's continuing challenge to the constitutionality of the death penalty in New Jersey, both on. its face and as applied, and, in particular, factor c(4)c's alleged vagueness; the consideration of felony murder as both an aggravating factor and a lesser-included offense of murder; the constitutionality of death qualification of juries; and the order of opening and closing statements. We have considered whether any departure should be made from our prior rulings on these issues and have concluded that no departure is justified.

Issues raised with respect to death-qualification and the exclusion of certain potential jurors and the failure of follow-up on jury *voir dire* are moot. Any retrial *voir dire* will be conducted in accordance with the standards set forth in *Bey II, supra,* 112 *N.J.* at 149–55, and *Williams, supra,* 113 *N.J.* at 408–45. The introduction of the photographs of the victim appears to have been reasonably related to the establishment of aggravating factor c(4)c. *Bey II, supra,* 112 *N.J.* at 181–83. On retrial the court shall continue to exercise discretion to determine the measure of their need. Comments made by the prosecutor in summation will be measured on remand in light of the evidence offered in any retrial according to the standards set forth in *Bey II, id.* at 166, and *Williams, supra,* 113 *N.J.* at 446–56. The trial court's failure to instruct the jury on the role of sympathy in its penalty phase deliberations has been covered in our decision in *Bey II, supra,* 112 *N.J.* at 171–72. On remand, the jury's deliberations shall conform to the standards set forth in *Bey II, supra,* 112 *N.J.* at 155–181. Finally, the lack of a specific finding that "death is the appropriate punish-

ment" was not error. *Ramseur, supra,* 106 *N.J.* at 316–17 n. 80.

Defendant contends that there was insufficient evidence to consider the elements of factor c(4)c. *See Biegenwald, supra,* 106 *N.J.* at 51 (on retrial, only "depravity of mind" element could be presented due to insufficient evidence of torture or aggravated battery). In *Ramseur, supra,* 106 *N.J.* at 197–211, and *Biegenwald, supra,* 106 *N.J.* at 48–52, Chief Justice Wilentz set forth the Court's understanding of the legislative meaning of this aggravating factor. The mutilation and stabbing of the victim here may indicate defendant's desire to make the victim suffer before he killed her, or, if these injuries were inflicted after the victim had died, they could constitute a mutilation of the corpse. *See Ramseur, supra,* 106 *N.J.* at 208–10 & n. 37. On this record, although there was some evidence of a revenge motive, a properly charged jury might have concluded that the murder served no purpose of the defendant other than the desire to kill. *See id.* at 209–11. Because there must be a retrial of the penalty phase, we do not resolve the adequacy of the c(4)c charge in this case. On remand, the court shall charge in accordance with the *Biegenwald* and *Ramseur* decisions, and the trial court should not submit to the jury any c(4)c elements that do not find support in the record.

## IV

### *Summary and Conclusion*

In this case, the State does not disagree that the weighing process employed in the penalty phase was inconsistent with our ruling in *State v. Biegenwald, supra,* 106 *N.J.* 13, and that the jury should be instructed that in order to impose the death penalty, it must find, beyond a reasonable doubt, that aggravating factors outweigh mitigating factors. Therefore, a retrial of the penalty phase is necessary.

We have resolved the other issues raised by defendant. With regard to the major issues, we are satisfied that there is no need to have a dual standard for measuring the competence of capital counsel. On any retrial, the court shall resolve whether defendant justifiably believed that he was communicating with his counsel's agent when he spoke with Gardner and the evidentiary consequences, and shall also instruct the jury with respect to the purpose of any evidence offered to demonstrate the victim's state of mind. Prior to capital resentencing, the court shall conform the procedures to the requirements of *State v. Gerald.* A retrial of the guilt phase will be required if the defendant does not plead to capital murder.

The sentence is vacated and the matter remanded to the Law Division for further proceedings in accordance with this opinion.

HANDLER, J., dissenting in part and concurring in part.

The defendant, Steven Davis, was arrested for the murder of his friend, Barbara Blomberg, in January 1983. He was indicted the following April on several counts of murder and weapons offenses. At his arraignment, approximately one week after the return of the indictment, the State served the defendant with a notice of aggravating factors, thus converting the case into a capital-murder prosecution. The defendant, represented by retained counsel, entered a plea of not guilty and not guilty by reason of insanity. Thereafter, on September 14, 1983, the defendant entered a plea of guilty to capital murder, thereby exposing himself to the death penalty.

The Court in its opinion observes that the indictment, to which defendant pled guilty, alleged two distinct crimes of murder in violation of *N.J.S.A.* 2C:11–3, one capital and the other non-capital. *Ante* at 367. Because defendant pleaded guilty to murder as charged in the indictment, the Court correctly concludes that the guilty plea must be set aside.

In my opinion, the defendant was not adequately advised of the consequences of his guilty plea and hence I agree with the Court that the plea must be vacated. However, I also believe, as a matter of constitutional dimension reflecting principles of due process, fundamental fairness, and the avoidance of cruel and unusual punishment, that a defendant in a capital prosecution may not be convicted of capital murder on a guilty plea unless that plea meets exacting standards. Such heightened requirements are mandated in a capital-murder prosecution, the consequences of which may be death. This augmented standard, I believe, must be available to the defendant on the remand of this case.

There are other issues addressed by the Court. I differ with respect to two of them. The aggravating factor of c(4)(c) in this case relates solely to "depravity." In my view, this standard, both as construed by this Court and as applied to the facts in this case, is unconstitutional on grounds of vagueness and overbreadth. Moreover, the depravity factor was not sufficiently explained to defendant as part of the plea proceeding, nor was it properly explained to the jury in the trial court's instructions in determining whether the death penalty should be imposed. Further, the evidence of depravity, I believe, is insufficient to establish the aggravating factor of c(4)(c), and principles of double jeopardy and fundamental fairness serve to bar the State from any further attempt to resentence defendant to death in reliance on this factor.

Finally, I differ from the Court's formulation of the standard governing effective assistance of counsel. It concludes, unwisely and unsoundly in my estimation, that a more stringent test for determining effective assistance of counsel is not required in capital-murder prosecutions.

These issues raise major concerns that I feel must be addressed. Their resolution, as well as continuing constitutional and statutory deficiencies that surround our capital-murder prosecutions, see, e.g., State v. Ramseur, 106 N.J. 123, 382–408

(1987) (Handler, J., dissenting) and *State v. Bey (II)*, 112 *N.J.* 123, 188–90 (1988) (Handler, J., dissenting) demand reversal of defendant's conviction and death sentence.

## I.

### A.

The record of the plea hearing in this case exposes the major substantive and procedural obstacles in entering a guilty plea to capital murder. At the plea hearing the defendant was questioned by his attorney and by the trial court to determine his understanding of the consequences of the plea as well as the voluntariness of the plea. His answers were limited largely to "yes" and "no" in response to rather lengthy and complicated questions. Nevertheless, with little or no probing by the trial court or counsel, he insisted that he understood the significance of his guilty plea and had decided to plead guilty. This, I believe, falls woefully short of what must be required to entertain a plea of guilty to capital murder that will expose the defendant to a death sentence.

This is what the record reveals. The basis for the decision to plead guilty was provided by the defense counsel in his questions to the defendant. Counsel indicated that he had talked with the defendant and his father at the jail on September 12, 1983. It was counsel who advised defendant to plead guilty. The defendant acknowledged that defense counsel had reviewed the confessions he had made to various people, the proofs against him, and the report of the defense psychiatrist, Dr. Willoughby, before advising him as follows:

Q And you recall my pointing out to you that it is her [Dr. Willoughby] professional opinion that you were insane at the time of the killing in a sense that you did not know the difference between right and wrong and could not appreciate the nature and quality of your act, however, that it was my judgment after having reviewed all the evidence and having consulted with other lawyers who do the same kind of work as I do, that given all the evidence and understanding that we have, this defense of insanity, that such a defense would not be successful in a court. Do you understand that?

A Yes.

Q And it is my further feeling that realizing the same jury would have to try the death penalty phase of the case, if you were convicted that we have a better chance of saving your life if we admitted that you committed these crimes and forthrightly told the jury. That on a death penalty phase or trial, rather than contesting the issue of whether or not you committed these crimes, or if you did, whether or not you were insane at the time you committed them; do you understand what I have just said?

A Yes

\* \* \* \* \* \* \* \*

Q So that you understand that by pleading guilty ... you are giving up your right to a jury trial on the issue of whether or not you committed these crimes, and ... you are giving up the right to present the psychiatrist and any other witnesses who would defend for you those charges. You are giving up the right that you have through me to cross-examine the witnesses and the State, giving up the right to prove that perhaps there is a reasonable doubt that you committed these crimes. You are giving up all these rights in exchange for what you might call a strategy to permit us to argue and to plead before the jury, a fresh jury, who has not heard you contesting the crimes that you have been charged with, contesting your guilt, to permit a fresh jury to hear ... why they should spare your life. Do you understand that?

A Yes.

Q Do you remember I explained all that to you and you asked me some questions? You first asked me if we were going to have one trial or two trials and that I recommended to you that we have just one trial, because I felt that if we put evidence before a jury first, that you would be convicted and that jury might be so upset that they would be much less likely, in my judgment, to spare your life at a second trial in the issue of the death penalty. Do you remember asking me about this?

A Yes.

Q And I told you the answer and you thought about it and you told me that you wanted to plead guilty, do away with the first trial ... and have one trial on the issue of whether or not your life should be spared. Do you remember that?

A Yes.

Q Are you satisfied with the choice that you made after talking with me?

A Yes.

\* \* \* \* \* \* \* \*

Q Do you agree with it?

A Yes.

Q Is there any question you want to ask of me or even the Judge ... before you agree to plead guilty?

A No.

Q Are you sure?

A Yes.

Following this questioning the defendant entered his plea of guilty, thus waiving his right to a trial on his guilt or innocence,[1] and at the same time automatically exposing himself to a sentencing trial at which he risked his life.

As noted, on the record, the plea establishes only that the defendant is guilty of murder as charged in the first count of the indictment. That count charged defendant with "purposefully or knowingly caus[ing] the death of *or serious bodily injury resulting in the death of* Barbara Blomberg." (emphasis added). Our decision in *State v. Gerald*, 113 *N.J.* 40 (1988), made clear that the second form of murder alleged in the indictment is non-capital murder. The question, therefore, becomes whether the plea itself nonetheless establishes the required intent to found capital murder.

The majority acknowledges that defendant's statement in the plea transcript contradicts the required intent that he purposely or knowingly killed Barbara Blomberg and therefore the guilty plea does not establish a factual basis for a capital conviction. *Ante* at 371. The Court also recognizes that because defendant was unaware of the *Gerald* distinction, he did not "fully understand" the material terms and relevant consequences of the offense to which he pled, and thus the plea was not knowing and voluntary. *Ante* at 368–370. I fully agree.

In this case, the plea transcript reiterated the defendant's statement in his confession, and later in his trial testimony, that he did not "go into that apartment with the idea or intention to kill her." But he did "in fact ... commit the acts." This Court

---

[1]This decision seems to have been based on the defense counsel's perception that the evidence of guilt with respect to the murder charge was overwhelming because of the defendant's confessions. No suppression hearing was requested—a decision challenged on appeal—because, as defense counsel stated: "I have made the legal judgment that the confession [is] ... not subject to exclusion, Your Honor, [under] the Miranda Rule or any other ruling."

has, in previous capital cases, minimized the significance of such contradictions or ambiguities in assessing the adequacy of the evidence to establish a defendant's guilt of capital murder. It has determined that although a jury's guilty verdict was based on such ambivalent evidence concerning the defendant's intent, there was no possibility that its determination was premised on the intent to cause only bodily injury that resulted in death. *See, e.g., State v. Pitts,* 116 *N.J.* 580, 614–20 (1989); *State v. Hunt,* 115 *N.J.* 330, 376 (1989). Hence, at least with respect to a jury verdict, even though a charge may present two distinct forms of murder, evidence of guilt of capital murder can be used to negate and overcome the latent ambiguity generated by such a charge as well as the potential confusion of a jury not attuned to the differences between the various forms of murder.

A plea, however, is very different in both substance and procedure from a jury verdict. In New Jersey, a guilty plea to a non-capital charge cannot be accepted unless the defendant has acknowledged his guilt. *State v. Reali,* 26 *N.J.* 222 (1958); *State v. Sands,* 138 *N.J.Super.* 103 (App.Div.1975), aff'd on other grounds, 76 *N.J.* 127 (1978); *R.* 3:9–2. The problem in this case is that while there may be sufficient facts available to support a finding that the defendant knowingly and purposefully committed murder, his statements contradict any such finding. Thus, I agree with the Court's disposition to vacate his guilty plea to capital murder. I would, however, further emphasize that this case illustrates the unique pitfalls that confront a defendant in a capital-murder prosecution. This record reveals the extreme uncertainties that can be encountered in entertaining a guilty plea to capital murder. It poses, moreover, other problems of comparable magnitude that implicate the standards required to govern a guilty plea to capital murder, touching on the kind of evidence that must be adduced to support such a guilty plea, identifying the critical consequences of such a guilty plea, and structuring an appropriate procedural framework within which a guilty plea can be taken.

### B.

*Rule* 3:9–2 provides that a guilty plea is not valid unless the defendant understands the nature of the charges and consequences of the plea. Thus, for a plea to be valid, "all material terms and relevant consequences [must] be clearly disclosed, fully understood, and knowingly and voluntarily accepted by the defendant." *State v. Warren,* 115 *N.J.* 433, 444 (1989). As noted, under *Rule* 3:9–2, a defendant in an ordinary criminal case can, and ordinarily does, supply the factual basis for his plea. However, the Rule creates an exception for capital defendants, allowing them to plead guilty without personally providing a factual basis, although a sufficient factual basis is still a prerequisite to acceptance of the plea. The rationale for this singular exception is that a defendant exposed to the death penalty should not be required to state anything that can support an aggravating factor; he need not aid in rendering his own death sentence. *See* Comment, Trial Judges Committee on Capital Causes, *reprinted in Pressler, Rules Governing the Courts of the State of New Jersey,* 533 (1989).

*Rule* 3:9–2 states:

When the defendant is charged with a crime punishable by death, no factual basis shall be required from the defendant before entry of a plea of guilty to a capital offense or to a lesser included offense, *provided the court is satisfied from the proofs presented that there is a factual basis for the plea.* (emphasis added).

Nevertheless, the *Rule* is silent in terms of the standards by which a court determines when it can be "satisfied" "that there is a factual basis for the plea" or in what form and within what procedural framework the court is to consider the "proofs presented."

In my opinion, because of the uniqueness of the crime of capital murder, the distinctive process by which ordinary murder is catapulted into capital murder, and the limited sentencing options mandated by a capital case, that is, life or death, the standards by which a defendant is informed of the nature and consequences of a guilty plea must be more meticulously de-

fined and scrupulously applied. Moreover, because of the bifurcated trial methodology for the prosecution of a capital case, the format for the taking of a guilty plea in a capital prosecution must be structured differently from that used in noncapital cases. In sum, I would insist on a heightened application of each of the major requirements that currently govern the validity of a guilty plea. These relate to the full disclosure and explanation of all material aspects of the plea, the adequacy of the defendant's knowledge and understanding concerning the basis for and consequences of a guilty plea, and the voluntariness of the plea; all of these relate importantly to the accuracy of the underlying facts that support criminal guilt. *See Warren, supra*, 115 *N.J.* at 443.

It is generally acknowledged that the most critical requirement in entertaining a guilty plea to a criminal offense is its factual basis. J. Barkai, "Accuracy Inquiries for All Felony and Misdemeanor Pleas: Voluntary Pleas But Innocent Defendants?," 126 *U.Pa.L.Rev.* 88, 90–91 (1977) (hereinafter *"Accuracy Inquiries"*). The existence of a factual basis for the plea serves a variety of purposes. It informs every important component of a valid guilty plea. It assists the judge in determining the understanding and voluntariness that attends the plea, provides a better record for appellate review if the plea is subsequently challenged, increases the visibility of charge-reduction practices, and aids correctional agencies in the performance of their functions. *See* 2 W. LaFave & J. Israel, *Criminal Procedures* § 20.4(f) (1984).

The primary justification for a factual-basis requirement is the protection it accords the defendant. *E.g., McCarthy v. United States*, 394 *U.S.* 459, 467, 89 *S.Ct.* 1166, 1171, 22 *L.Ed.*2d, 418, 426 (1969); *Brown v. State*, 250 *A.*2d 503, 505 (Del.Super.Ct.1969); *McCall v. State*, 9 *Md.App.* 191, 199, 263 *A.*2d 19, 25 (1970). The protection rationale is based on the assumption that because some innocent defendants will offer guilty pleas, or defendants guilty of different or lesser offenses will seek to plead to offenses they did not commit, such defen-

dants can be protected only if a factual basis is required before their pleas are accepted. *See* A. Goldstein, The Passive Judiciary, 1, 33 (1981). Thus, the factual-basis requirement in any plea proceeding assures accuracy and the function of accuracy ensures that no defendant offers a plea without understanding and realizing that his or her conduct actually falls within the charge. Barkai, *Accuracy Inquiries, supra,* 126 *U.Pa.L.Rev.* at 95.

Consequently, in my view, we must approach the issue of the factual basis for the guilty plea in a capital case not from the perspective of the contractual justification of plea bargaining [2] or the reasonable expectations of the parties, but rather with regard to whether the evidence actually supports the plea, that is, whether the defendant really committed the crime and whether the defendant understands that the facts justify and comport with guilt of the crime.

In light of the importance of the factual-basis requirement, a more stringent evidentiary standard, both in terms of the source of the evidence and the standard of proof necessary to establish facts, must therefore be invoked. I believe that the evidence should be competent [3] as well as relevant and that the

---

[2]Frequently, when the guilty plea is the result of a plea bargain, the true nature of the evidence does not support the offense to which the defendant pled. Often the offense to which he pleads will carry a lesser penalty. Nevertheless, because the negotiated plea is the result of legitimate bargaining by both the defendant and the State, with each side receiving a mutual advantage, courts are often reluctant to deny the defendant the benefits of such a bargain and will accept the plea despite its inaccurate factual basis. J. Bond, *Plea Bargaining and Guilty Pleas,* ch. 3, at 116–17 (1983).

[3]In accepting guilty pleas in ordinary criminal matters, judges routinely accept all types of evidence, competent or not, in establishing a factual basis. *See, e.g., People v. Alvarez,* 181 *Colo.* 213, 508 *P.*2d 1267 (1973) (presentence reports); *State v. Anderson,* 270 *Minn.* 411, 134 *N.W.*2d 12 (1965) (charging documents); *State v. St. Clair,* 194 *Neb.* 519, 233 *N.W.*2d 780 (1975) (presentence report); *Little v. State,* 85 *Wis.*2d 558, 271 *N.W.*2d 105 (1978) (hearsay); *Hitlaw v. State,* 178 *Ind.App.* 124, 381 *N.E.*2d 527 (1978) (affidavits). Nevertheless, at least some courts have questioned the validity of such practices,

standard of proof to be employed in capital guilty pleas should be "beyond a reasonable doubt." [4] I would also insist that the taking of the guilty plea be based on actual proof of guilt, or the reliable proffer of such proof, that clearly satisfies the court that such evidence, if produced at trial, would enable a reasonable jury to conclude that defendant is guilty of capital murder beyond a reasonable doubt. Moreover, even though evidence may be proffered rather than introduced, the underlying evidence must be "competent" in order to constitute a factual basis to a capital plea. *Cf.* Barkai, *Accuracy Inquiries, supra,* 126 *U.Pa.L.Rev.* at 136–37 ("the judge can question the witnesses under oath, separate personal knowledge from hearsay, and inquire into facts related to specific defenses."). Statements by both the prosecutor and defense counsel may also aid in establishing an accurate factual basis, as both presumably have personally investigated the case and are knowledgeable about the law. Moreover, the court must be satisfied that the evidence proffered must be shown to be available to the State through present and competent witnesses.

---

particularly where the court has relied on the method exclusively. *See, e.g., United States v. White,* 483 *F.*2d 71, 73 (5th Cir.1973) (the record must reveal a factual basis for the plea in addition to representations such as those made in the affidavit).

4Most states do not impose any particular standard in the taking of guilty pleas in criminal matters. Bond, *Pleas, supra,* ch. 3, at 130–32. A number of states have explicitly rejected the reasonable-doubt standard. *See, e.g., State v. Varela,* 120 *Ariz.* 596, 587 *P.*2d 1173 (1978); *Spinella v. State,* 85 *Wis.*2d 494, 271 *N.W.*2d 91 (1978). Instead, the courts have described a variety of less stringent tests: credible evidence that would support a jury verdict, strong or substantial evidence of actual guilt, *Varela, supra,* 587 *P.*2d 1173, or reasonable basis for concluding that defendant actually committed the crime, *United States v. Neel,* 547 *F.*2d 95 (9th Cir.1976). One commentator has suggested that the appropriate standard for determining the adequacy of the factual basis is the directed verdict standard. Barkai, *Accuracy Inquiries, supra,* 126 *U.Pa.L. Rev.* at 140. Alabama, however, requires the State not only to prove a defendant's guilt beyond a reasonable doubt in the event he pleads guilty to a capital offense, but also to prove it to a jury. Ala.Code § 13A–5–42 (1972) (West Supp.1988).

Further, the court should have the authority to call witnesses and require the production of actual evidence for good cause.

The knowledge and understanding of the defendant who pleads guilty to capital murder are critically important. Hence, the trial court must explain to the defendant *all* elements of the offense of capital murder. *See, e.g., United States v. Coronado,* 554 *F.*2d 166 (5th Cir.) (defendant should be advised as would a jury be instructed on the law), *cert.* den., 434 *U.S.* 870, 98 *S.Ct.* 214, 54 *L.Ed.*2d 149 (1977). In this case, for example, the majority has acknowledged and definitively stated that a capital defendant must be made aware of the distinction between the two forms of murder embraced by *N.J.S.A.* 2C:11–3(a)(1) and (2); the defendant must further understand the consequences of that distinction. At the very least, the court must explain, and presumably contrast, the element of intent for both capital murder and serious-bodily-injury murder.[5] Moreover, the explanation must be genuinely intelligible and understandable to the defendant. "It is not sufficient for the trial court to explain the formal charges in legal terminology alone, but [the Court] should use language a lay defendant can understand." *Riley v. Ziegler,* 161 *W.Va.* 290, 241 *S.E.*2d 813, 815 (1978); Bond, *Pleas, supra,* ch. 6, at 8.

Further, we have recognized that the penal—the sentencing—consequences are a critical and material aspect of a knowing and voluntary guilty plea. *See, e.g., Warren, supra,* 115 *N.J.* at 444; *State v. Taylor,* 80 *N.J.* 353 (1979). Because the death sentence is a potential consequence of a guilty plea to capital mur-

---

[5]Other "material terms" of capital murder, if relevant in a given case, should be explained to the defendant. Thus, the "own conduct" requirement would be material because it is an element of murder that separates ordinary murder from capital murder, serving both to define and differentiate capital murder and thus narrowing the class of death-eligible defendants. *State v. Moore,* 113 *N.J.* 239, 311 (1988) (Handler, J., concurring).

der, more exacting standards must govern the treatment of this penal consequence. In an ordinary case, we strive to give the defendant a maximum amount of information concerning his sentencing risks. *See, e.g., Warren, supra,* 115 *N.J.* at 444–45. We have recently amended our rules to permit the sentencing consequences to be addressed more specifically. *See R.* 3:9–3(c). 123 *N.J.L.J.* 1350 (June 1, 1989). The defendant in the ordinary case is also informed of the sentencing process and the possible or likely sentence he will receive. We further recognize that if a defendant's sentencing expectations are disappointed he may retract his guilty plea. *See Warren, supra,* 115 *N.J.* at 444.

Sentencing for capital murder is different from ordinary sentencing in every major aspect. We have, nonetheless, struggled to accord a capital defendant the same entitlements due any defendant when being sentenced. *See, e.g., State v. Zola,* 112 *N.J.* 384, 428–32 (1988) (defendant has right of allocution); *State v. Koedatich,* 112 *N.J.* 225, 327–32 (1988) (an attorney must present mitigating factors on behalf of a defendant); *State v. Bey (II), supra,* 112 *N.J.* 123, 171–72 (1988) (though not charged, mercy and sympathy may be considered by a jury in addressing sentence); *State v. Davis,* 96 *N.J.* 611, 619–21 (1984) (proof of mitigating factors not governed by rules of evidence). Thus, the trial court in a capital case should explain that once it has accepted the plea, the defendant is to be turned over to a jury,[6] which will decide his or her fate. Further, the defendant should be made aware of precisely how the jury reaches its determination. Therefore, the concept of aggravating and miti-

---

[6]The defendant may, of course, waive a jury for the penalty phase. The court should explain the ramifications of such a course. I would think it incumbent upon the Court to explain the twelve-fold reduction in the chance of avoiding the death penalty by foregoing a jury trial. Indeed, the chance may be greater: there is a twelve-fold chance that a single juror may not find the existence of a necessary aggravating factor and, also, the additional twelve-fold chance that a single juror may not find that existing aggravating factors outweigh mitigating factors beyond a reasonable doubt. *See, e.g., State v. Biegenwald,* 106 *N.J.* 13, 53–67 (1987).

gating factors, the elements for determining the existence of such factors, the balancing process entailed in their weighing and the standard of proof that applies should also be explained. The defendant should thus be made cognizant of what the State must prove, and is prepared to prove, to establish the aggravating factor(s) alleged in the case, and must be given an adequate basis to consider and determine the likely outcome of the sentencing phase. *See Taylor, supra,* 80 *N.J.* at 363. Finally, because it is a guilty plea that automatically exposes the defendant to a sentencing trial, the court should also require the State to demonstrate the evidence available to prove aggravating factors.

These considerations forcefully demonstrate that the taking of the guilty plea in a capital-murder prosecution should be structured with greater formality. The entry of a judgment of conviction of guilt of capital murder based on a guilty plea approximates a jury's determination of guilt following a trial. While the plea record cannot be used at capital sentencing, the fact of defendant's guilty plea can. The Court should therefore insist on necessary procedural protections to assure the integrity of the guilty plea process and to prevent its misuse or misapplication in the sentencing trial. For example, the defendant should have full discovery. The court should also determine initially in what form evidence should be adduced or proffered. Further, the court should satisfy itself independently that defendant understands fully the elements of the crime of capital murder and the sentencing consequences, including the procedures, substantive standards and possible outcomes that are unique to a capital-murder prosecution. To this end the court itself would be authorized to require pretrial proceedings to explore and ascertain the problems that may be involved in the taking of a guilty plea that will bear on its ultimate validity.

In sum, I do not believe a court can entertain a guilty plea to capital murder unless it is clearly established to the satisfaction of the trial court, apart from any incriminating statements

made by defendant when pleading, that there is a factual basis for a conviction of guilt of capital murder, and that the State could introduce competent and relevant evidence that would enable a reasonable jury conscientiously, carefully, and fairly considering such evidence to determine beyond a reasonable doubt that defendant is guilty of capital murder.

Further, because the plea of guilty to capital murder must anticipate the penal possibility of a death sentence, it must reflect the knowledge, understanding, and the willingness of the defendant to expose himself to a death sentence. Thus, the defendant must be informed of the evidence and the procedures by which he may indeed be given the penalty of death. Such knowledge and understanding, I think, should be a constituent part of the plea to capital murder itself. The defendant quite clearly need not—and should not—be allowed to incur the death sentence without the judicial confirmation of these requisites. Finally, before the defendant can be exposed to a penalty trial for the imposition of the death sentence, the court must be clearly satisfied, when entertaining the defendant's guilty plea to capital murder, that the State in the penalty phase of the case will be able to introduce competent and relevant evidence. That evidence must be such that it would enable such a jury to find beyond a reasonable doubt an aggravating factor capable of outweighing any mitigating factors.

I think it behooves the Court to address these issues more systematically. The consequences of a failure to do so can be drastic for a capital defendant. Indeed, they can be for society in general, which has no purpose or desire in allowing the execution of a defendant not fully deserving the death penalty in accordance with the rigorous procedures demanded by our Constitution. In this case, the heightened standards that should govern a plea of guilty to capital murder were not met, consequently providing an additional reason for vacating defendant's conviction of murder.

## II.

Defendant was sentenced to death because the jury was persuaded that the State had proved beyond a reasonable doubt both that aggravating factor c(4)(c) existed and that it outweighed any mitigating factors. Aggravating factor c(4)(c) in this case hinged on the alleged "depravity" of the murder. The evidence of depravity consists solely of the mutilation of the victim's body after she was strangled, as testified to by the Medical Examiner. The doctor's examination revealed that Blomberg had been killed between 11:30 p.m. and 5:30 a.m. on January 17th, and that the cause of death was "ligature strangulation." His external examination of the victim's body revealed numerous stab wounds, some made shortly after death, others at least twenty minutes later.

The capital-murder statute provides that an aggravating factor exists if "the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim." *N.J.S.A.* 2C:11–3c(4)(c). The Court recognized in *State v. Ramseur, supra,* 106 *N.J.* at 198–201, that this statutory definition of capital murder was unconstitutional in its vagueness and overbreadth. The Court then redefined this factor in an attempt to give it needed specificity and narrowness. It held that aggravating factor c(4)(c)

> encompasses (1) murders "in which the defendant intended to cause extreme physical or mental suffering" prior to death, but only where the victim actually felt pain or suffered, as well as (2) murders manifesting depravity of mind, where, in other words, "the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder and served no purpose for the defendant beyond his pleasure of killing...." [106 *N.J.* at 209.]

Thus, the Court envisaged a murder committed with depravity as one *not* accompanied by "emotions ordinarily associated with murder" *and* done only for the "pleasure of killing." The Court, in *Ramseur,* also determined that post-death mutilation may sustain the "depravity of mind" prong of c(4)(c). 106 *N.J.* at 209–10 n. 37. The facts in this case, however, underscore the

infirmity of this definition or application of the depravity standard.

This case presents no evidence that the defendant "intended to cause extreme physical or mental suffering prior to [the] death" of the victim. With respect to whether the murder was one "manifesting depravity of mind," there is no direct evidence that the defendant did *not* have any of the "emotions ordinarily associated with murder" *and* that he committed the murder solely for the "pleasure of killing." The only evidence adduced consists of the mutilation of the body after death.

I acknowledge that approximately twenty-two states permit the imposition of the death penalty based on a finding that a murder was, in some ill-defined way, worse than other murders, and that mutilation of the victim's body after death can be relevant to whether a murder is of the horrific sort. *See* Richard A. Rosen, "The 'Especially Heinous' Aggravating Circumstance in Capital Cases—The Standardless Standard," 64 *N.C.L.Rev.* 941 (1986). By its decision in this case, the Court aligns itself with this position; in the lexicon of *Ramseur*, the Court evidently believes that post-death mutilation constitutes sufficient evidence of (1) the absence of emotions ordinarily associated with murder and (2) the presence of pleasure as the sole reason for killing.

Yet, the intractable problem in understanding, defining, and applying "depravity" as a standard is the conceptual impossibility of confining the standard to the evidence available. The concept of "depravity" is so amorphous and unbounded that in the final analysis any determination of its existence is inherently speculative. The use of post-death mutilation evidence does not salvage the standard; it neither clarifies its definition, nor restricts its reach, nor guides its application.

This is exemplified by the depravity standard we adopted in *Ramseur*, where we chose to follow the path of the Georgia court. As I pointed out in *Ramseur*, however,

The Georgia court has found that physical harm to the victim after death will support a finding of depravity of mind. *See Fair v. State*, 245 *Ga.* 868, 268 *S.E.*2d 316, *cert.* denied, 449 *U.S.* 986, 101 *S.Ct.* 407, 66 *L.Ed.*2d 250 (1980) (defendant who mutilates or seriously disfigures the victim's body after death may be found to have a depraved mind). Moreover, in interpreting "depravity of mind," the Georgia court has found that age and physical characteristics of the victim may be considered, *see Thomas v. State*, 247 *Ga.* 233, 275 *S.E.*2d 318 (1980), *cert.* denied, 452 *U.S.* 973, 101 *S.Ct.* 3127, 69 *L.Ed.*2d 984 (1981), as well as the intent to inflict psychological distress on a witness. *Strickland v. State*, 247 *Ga.* 219, 275 *S.E.*2d 29, *cert.* denied, 454 *U.S.* 882, 102 *S.Ct.* 365, 70 *L.Ed.*2d 192 (1981). The Georgia Supreme Court has on occasion, moreover, simply recited the facts of cases in which no torture or battery occurred and concluded that *these* facts evidenced a depraved mind. *See Godfrey, supra*, 446 *U.S.* at 436 [100 *S.Ct.* at 1768], 64 *L.Ed.*2d at 411 (Marshall, J., concurring). This is especially true of instantaneous gunshot murders, which the Georgia court labels "execution-style" by way of reaching its depravity conclusion. *See, e.g., Solomon v. State*, 247 *Ga.* 27, 277 *S.E.*2d 1 (1980), *cert.* denied, 451 *U.S.* 1011, 101 *S.Ct.* 2348, 68 *L.Ed.*2d 863 (1981) (execution-style murder of unarmed robbery victim); *Ruffin v. State*, 243 *Ga.* 95, 252 *S.E.*2d 472 (1979), *cert.* denied 444 *U.S.* 995, 100 *S.Ct.* 530, 62 *L.Ed.*2d 425 (1979) (shotgun murder of child showed depravity); *Banks v. State*, 237 *Ga.* 325, 227 *S.E.*2d 380 (1976), *cert.* denied, 430 *U.S.* 975, 97 *S.Ct.* 1667, 52 *L.Ed.*2d 370 (1977) (defendant's shooting of two non-offending defenseless persons execution-style was depraved). In still other cases, the Georgia Supreme Court has simply noted, in conclusory fashion, that "the evidence supported the jury's finding under § (b)(7)." *Godfrey v. Georgia, supra*, 446 *U.S.* at 440 n. 12, 100 *S.Ct.* at 1771 n. 12, 64 *L.Ed.*2d at 414 n. 12 (Marshall, J., concurring) (citing cases). [106 *N.J.* at 397–98.]

The Florida Supreme Court has determined that post-death desecration or mutilation of the corpse of the victim is not probative of whether a killing is heinous. The Court made its initial determination that evidence of post-death mutilation was irrelevant to their especially heinous aggravating circumstance in *Halliwell v. State*, 323 *So.*2d 557 (Fla.1975). That case involved a love triangle in which defendant flew into a violent rage after the husband of the woman he loved had beaten her. Defendant grabbed a nineteen-inch metal bar and beat the husband's skull with lethal blows and then continued beating, bruising, and cutting the husband's body with the metal bar after the first fatal injuries to the brain. Several hours later, defendant used a saw, machete, and fishing knife to dismember the body of his former friend and placed it in the creek. In

holding that the dismembering of the body was irrelevant to finding the murder "especially heinous," the Court stated:

It is our opinion that when Arnold Tresch died, the crime of murder was completed and that the mutilation of the body many hours later was not primarily the kind of misconduct contemplated by the Legislature in providing for the consideration of aggravating circumstances. If mutilation had occurred prior to death or instantly thereafter it would have been more relevant in fixing the death penalty. [323 *So.*2d at 561.]

Part of the difficulty in using this kind of evidence of post-death conduct is in relating it to the homicidal act. The interval of time alone cannot render such evidence probative. For example, in *Halliwell,* the Florida Court noted that the post-death conduct was "several hours later." Yet in subsequent cases the time interval is shortened considerably—to simply "after death." Thus, in *Pope v. State,* 441 *So.*2d 1073 (Fla.1983), the Florida Supreme Court succinctly stated that "[e]vents occurring after death, no matter how revealing of depravity and cruelty, are not relevant to the atrocity of the homicide." *See also Smith v. State,* 344 *So.*2d 915 (Fla.Dist.Ct. App.1977) ("evidence relating to deeds after the killing would not be relevant to the issue of whether the crime was committed in such a heinous manner as to justify the death penalty"),[7] overruled on other grounds *sub nom. Ruffin v. State,* 397 *So.*2d 277, 279 (Fla.), *cert.* den., 454 *U.S.* 882, 102 *S.Ct.* 368, 70

---

[7]Another line of Florida cases concentrates on the second theme expounded by the *Halliwell* court concerning "the kind of misconduct contemplated by the Legislature in providing for the consideration of aggravating circumstances." It appears that a kind of misconduct not contemplated by the Legislature as warranting the death penalty occurs when the defendant damages the corpse in an effort to conceal it. Thus, in *Herzog v. State,* 439 *So.*2d 1372 (Fla.1983), the Court held that the trial court's finding that the disposal of the body is a factor that can be considered in determining heinousness was actually irrelevant to such a determination. *Id.* at 1380. And in *Simmons v. State,* 419 *So.*2d 316 (Fla.1982), the Court held that evidence that defendant "attempted to conceal the murder by burning the body" would not support a finding of heinousness. *See also Blair v. State,* 406 *So.*2d 1103 (Fla.1981) (manner in which defendant disposed of victim by burying her remains in the rear yard of her home and pouring a concrete slab over the burial site would not support a finding of heinousness).

*L.Ed.*2d 194 (1981). *But see, Peavy v. State,* 442 *So.*2d 200 (Fla.1983) (where majority held that evidence of a sugary substance and a liquid poured into a large wound on the victim's abdomen constituted enough evidence to support a finding of heinousness, the concurrence urged that the trial court relied incorrectly on what was done to the body after death).

What is lacking in the majority's analysis in this case is recognition that depravity must be connected with the act of killing. Under c(4)(c), it must be shown that *the murder itself* involved depravity of mind. Thus, even if mutilation could be evidence of depravity, the difficult question is whether the depravity is evidence of the kind of murder that was committed. This may depend on whether so much time has passed between the murder and the mutilation that one cannot say that the defendant exhibited a depraved mind at the time he committed the murder.

The Tennessee Supreme Court, in considering this problem in *State v. Williams,* 690 *S.W.*2d 517 (1985), held that where circumstances of the disposal of the victim's body, including use of an explosive, dogs, and the burning of the house with the body in it, occurred nearly forty-eight hours after the homicide, the interval of time between death and mutilation was so great that "the inference cannot be fairly drawn that the murderer possessed the depravity of mind at the time the fatal blows were inflicted, [and] then it cannot be said that the murder, itself, involved depravity of mind." *Id.* at 530; *cf. State v. O'Guinn,* 709 *S.W.*2d 561 (Tenn.) (a "victim need not have been alive in order to demonstrate the perpetrator's depravity of mind if the acts occurred so close to the time of the victim's death that the inference can be fairly drawn that the murderer possessed that depravity of mind at the time of the actual killing."), *cert.* den. *sub nom. O'Quinn v. Tennessee,* 479 *U.S.* 871, 107 *S.Ct.* 244, 93 *L.Ed.*2d 169 (1986). Thus, according to the Tennessee Supreme Court, if "the inference cannot be fairly drawn that the murderer possessed the depravity of mind *at the time the fatal blows were inflicted,* then it cannot be said

that the murder itself[ ] involved depravity of mind." *Ibid.* This would suggest that the mutilation must occur instantly or shortly after the infliction of the fatal blows to enable one to infer that the lethal acts themselves were undertaken by a defendant exhibiting a depraved state of mind.

Our own standard, however, does not reconcile the conflicting notions of depravity attending death and mutilation following death. The statute, as the Court has defined it, requires that the murder *involve* depravity; in order to establish depravity by mutilation of a corpse, it also requires that a defendant knew he was acting on a dead body. *Ramseur,* 106 *N.J.* at 210 n. 37. Thus, on one hand, the Court would require that mutilation must occur sufficiently proximate in time to the killing in order for the murder itself to have been committed with a depravity of mind; on the other hand, enough time must elapse between the killing and the mutilation in order for the defendant to figure out that the person is dead. Thus, with respect to capital murder, timing is an essential component of depravity, but it is simply too elusive to be a reliable determinant.

The Court may believe it has sufficiently clarified and narrowed the meaning of depravity by insisting it be shown that the defendant knew it was a dead body he intentionally damaged. In suggesting such post-death mutilation as a definition of depravity, however, the Court necessarily divorces such acts from the homicidal act itself. I thus argued in dissent in *Ramseur,* and I do now, that a standard based on such a construction is unmanageable because in cases where there are multiple wounds and the moment of death is indeterminate, the jury, without clear guidance, can find either suffering before death or, if pain cannot be proved, mutilation after death. Similarly, in the recent case of *State v. Zola, supra,* 112 *N.J.* 384, the majority, in examining the sufficiency of the evidence to support c(4)(c), was indefinite on this point. It merely stated: "[t]he wounding and scalding of the victim here may indicate defendant's desire to make the victim suffer before he killed her, or, if these injuries were inflicted after the victim had died,

they could constitute a mutilation of the corpse." *Id.* at 434. This was reiterated in *State v. Matulewitz,* 115 *N.J.* 191, 194-95 (1989) (commenting on *Zola,* "we observed that the scalding or stabbing of the body of the strangled victim could establish either an intent to inflict nonlethal, purposeful torment or a senseless desecration of the victim's body.")

The majority in its opinion here is equally indifferent to the need to correlate the acts of mutilation to the killing itself, stating simply that "the mutilation and stabbing of the victim here may indicate defendant's desire to make the victim suffer before he killed her, or, if these injuries were inflicted after the victim had died, they could constitute a mutilation of the corpse." *Ante* at 376. In effect, we are holding that any murder in which there are many wounds can be found to be aggravated under c(4)(c).

Given the dual use that can be made of cases involving multiple wounds unrelated to the time of death, each of these cases will inevitably turn into ghoulish exercises undertaken to persuade a jury that the post-death desecration, not the murder, was disgusting and revolting; and this will be done, undoubtedly, by the most horrific evidence that can be found. It is the inflammatory content of such evidence that will be stressed by the State to show "depravity." The irony and unfairness of this is that a defendant will be helpless to counter this evidence. A defendant will be powerless to claim, under Evidence Rule 4, that the probative worth of such evidence is outweighed by its prejudice—its inflammatory content is precisely the same.

This implicates an issue concerning the sufficiency of such evidence. In this case, the evidence of post-death mutilation was not in any way related to the act of killing. The evidence adduced thus was clearly insufficient to establish depravity as encompassed by aggravating factor c(4)(c). It would be, in my view, fundamentally unfair and a violation of principles of double jeopardy to allow the State an additional opportunity to again prove depravity through the use of additional evidence,

including that relating to post-death mutilation. *See, e.g., Biegenwald, supra,* 106 *N.J.* at 98–109 (Handler, J., dissenting) (violation of double jeopardy to allow State a second opportunity to prove depravity under c(4)(c) when evidence was insufficient to establish aggravated battery or torture in first trial leading to the death penalty); *accord Ramseur, supra,* 106 *N.J.* at 457–68 (Handler, J., dissenting). To allow the State to pursue the death penalty again relying on evidence of depravity is tantamount to retrying defendant for the same crime; this is violative of principles of double jeopardy. *See Biegenwald, supra,* 106 *N.J.* at 103 (Handler, J., dissenting).

What is most troublesome about using post-death mutilation inflicted for self-pleasure as an aggravating factor is that it will constitute cogent evidence that the defendant is truly insane. Mutilating a corpse for no apparent purpose is a strong indicator of an acutely sick mind; yet, it is unlikely defense counsel would present such evidence at the guilt phase to bolster an insanity defense or diminished capacity argument because counsel thereby runs the risk of establishing c(4)(c) for the State. Are we not thus preventing defense counsel from proving that the defendant was not responsible for his or her actions because the defendant was not of the right mind?

The Court in *Ramseur* believed that "depravity of mind" relates principally to the absence of motive. It is this absence of purpose behind the defendant's murderous actions that inferentially suggests that the defendant did it for pleasure and thus indicates a depraved mind. However, in my perception, post-death mutilation, particularly when it constitutes the sole aggravating factor, is just not a sufficient reason to put someone to death. It may be that the "motiveless" definition of depravity of mind is legitimized by the necessity to protect society from killers who strike with no reason. As the Chief Justice said in *Ramseur,* depravity of mind "isolates conduct that causes the greatest abhorrence and terror within an ordered society, because citizens cannot either in fact or in perception protect themselves from these random acts of violence." 106

*N.J.* at 209. I do not believe post-death desecration invokes the same societal concern. One may ask, does not purposeless mutilation that is not part of the homicidal act itself demonstrate only profound mental sickness?

The mutilation definition of depravity traceable to the *Ramseur* formulation is, in my view, a subjective requirement; it is distinguished from aggravated battery and torture "by the distinct mental state that causes a murderer intentionally to damage a body that *he believes* is no longer a live human being." *Ramseur,* 106 *N.J.* at 210 n. 37. In order for there to be sufficient evidence to support the "depravity of mind" prong of c(4)(c), the prosecutor must proffer some evidence that defendant, as opposed to the reasonable person, actually believed he was damaging a corpse.

Thus, the depravity standard, defined in part by acts of post-death desecration, raises a deep concern:

> The point, however, is that motives are both innumerable and, ultimately, inscrutable; this is evidenced by the majority's own open-ended catalog of standard motives for murder ("greed, envy, revenge, or another of those emotions ordinarily associated with murder....") *ante* at 211. Indeed, to the extent that a given defendant is likely to fit within the majority's definition of depravity, *i.e.,* his motives are inexplicable in ordinary terms, he is also likely to verge on insanity. It is troubling that our society, which seeks to safeguard its citizens against arbitrary treatment by the state, responds to its most disturbed citizens by executing the depraved while acquitting the insane.
>
> [*Ramseur, supra,* 106 *N.J.* at 401 (Handler, J., dissenting).]

The words "depravity of mind," according to *Ramseur,* "mark society's concern to punish severely those who murder without purpose or meaning as distinguished from those who murder for a purpose (albeit a completely unjustified purpose)." 106 *N.J.* at 209. "The killer who does it because he likes it, perhaps even because it makes him feel better ... evinces what we define as depravity of mind." *Ibid.* Yet this case underscores the deficits of the depravity standard in effectuating that philosophy. The record discloses a strangulation murder. It is not contended that without more such a murder, in the parlance of capital-murder law, is the kind of egregious, heinous, or horrific murder under c(4)(c) that demands the penalty

of death. While the post-death desecration of a corpse is unquestionably revolting, there is simply no principled way to use such evidence in these circumstances to establish a depraved killing, as opposed to a killing by a depraved person. Nevertheless, this is a distinction that we are importuned to make under our Constitution if we are to avoid the imposition of cruel and unusual punishments. The capital murder statute may have been intended to secure the punishment of sadistic killers; it was not intended to authorize the execution of necrophiliacs.

## III.

The final issue is whether the defendant was denied effective assistance of counsel guaranteed under both the sixth amendment to the federal Constitution and Article I, paragraph 10 of the State Constitution. Defendant claims that he was denied effective assistance at the guilt phase by his counsel's failure (1) to consult with him adequately about the case; (2) to investigate and pursue a psychiatric and/or diminished capacity defense; (3) to advise him of his right to testify; and (4) by counsel's introduction of highly prejudicial evidence and his numerous errors of law. Defendant also claims he was denied effective assistance at the penalty phase by counsel's failure to investigate and present a "meaningful" case in mitigation. The thrust of the Court's opinion is that aside from the infirmities of defendant's guilty plea, not attributable primarily to counsel, defendant was adequately represented. Its standard for determining the adequacy of such legal representation is, in my view, wholly inadequate to accord the protections to which one charged with capital-murder is entitled.

The federal constitutional standards for ascertaining whether a defendant has been afforded effective assistance of counsel were set forth relatively recently in *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and *United States v. Cronic*, 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657

(1984). Those standards were adopted by this Court as a matter of state constitutional law in *State v. Fritz*, 105 *N.J.* 42, 58 (1987). In *Fritz*, a non-death penalty case, we repudiated the "farce and mockery" standard for ineffective assistance found in earlier New Jersey cases as creating perhaps too high a standard for defendants to satisfy. The Court traced the evolution in the federal courts away from a requirement that a defendant show that the performance of counsel rendered the trial a "farce and mockery," and toward a standard of "reasonably competent assistance." *Id.* at 50–51. This evolution, the Court stated, culminated in and was synthesized by the Supreme Court's standards in *Strickland*. We ruled that "if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." *Id.* at 58.

It should be emphasized that the Court in *Fritz* was faced with an ordinary criminal prosecution. The Court intimated no view on whether it agreed with the *Strickland* Court's separate conclusion that the context of a capital sentencing trial was indistinguishable from a non-capital prosecution, or whether a different standard for evaluating effectiveness of assistance in death-penalty cases should obtain. *See Ramseur*, 106 *N.J.* at 364 n. 12 (Handler, J., dissenting).

The Court in this case now rules that the *Strickland/Fritz* standard governing ineffective assistance of counsel is adequate for evaluating attorney performance in capital cases, conceding, however, that the presumption of competence under the *Strickland/Fritz* standard is inappropriate in the context of capital punishment litigation. It says:

> We see no need, then, to alter the *Strickland/Fritz* standard for capital cases. Capital defendants are guaranteed competent capital counsel. Obviously the measure of an advocate's competency depends on the task to be accomplished. The best intentions and the most devoted of efforts do not necessarily equate with capital competence. We expect capital defense counsel to have an expertise regarding the special considerations present in capital

cases. The *Strickland/Fritz* standard demands no less. [*Ante* at 356 (citations omitted).]

I disagree with the notion that the *Strickland/Fritz* standard is appropriate in capital cases. I believe the "special considerations present in capital cases" demand specialized competence on the part of counsel. Counsel in these cases must provide competence grounded in experience, training, and professional skill that will suffice to provide a defendant with the full measure of all the heightened protections a capital-murder prosecution engenders. It is not sufficient to define the professional competence required in a capital-murder prosecution as one that is "reasonable" in terms of an average attorney or is measured by the "task to be accomplished." These definitions carry no intrinsic meaning or objective guidance. As Justice Marshall stated in his objection to the performance standard that is adopted by the Court today: "[the standard] is so malleable that, in practice, it will either have no grip at all or will yield excessive variation in the manner in which the Sixth Amendment is interpreted and applied.... To tell lawyers and the lower courts that counsel for a criminal defendant must behave 'reasonably' and must act like 'a reasonably competent attorney' ... is to tell them almost nothing." *Strickland, supra,* 466 *U.S.* at 707–08, 104 *S.Ct.* at 2075, 80 *L.Ed.*2d at 706 (Marshall, J., dissenting) (citations omitted).

It is thus unfortunate that the majority squanders the opportunity to formulate a more protective standard or even provide clearer guidance than that which can be gained from its talismanic invocation of "reasonableness." Indeed, the Court even provides contradictory signals; although the majority notes that good intentions and devoted efforts do not necessarily denote capital competence, it goes on to celebrate precisely these characteristics of defense counsel's performance in this case. *Ante* at 359–360. I do not intend to demean these characteristics, but I must point out that the Court does not come close to dealing with the professional adequacy of coun-

sel's performance in terms of ensuring a level of competence that should be brought to bear when a client's life is at stake.

The Court in this case, despite protestations to the contrary, sees no difference between capital and non-capital prosecutions and no difference between capital and non-capital defendants. It says:

> we do not feel impelled to adopt stricter standards for judging constitutional rights in capital cases than in noncapital cases. To judge capital defendants differently would effectively diminish the rights of noncapital defendants, a disquieting result that we reject. There either is a constitutional violation or there is not. There can be no double standards. At the same time, we have committed ourselves to a searching and stringent review of capital records, which, we believe, coupled with an enhanced application of the harmless error standard, would be "sufficiently flexible to accommodate our heightened concerns and responsibilities in reviewing death penalty prosecutions." [*Ante* at 356 (citation omitted).]

I do not understand how affording a capital defendant the assistance of counsel that is sufficiently effective to assure and maximize the protections of a person facing the death penalty can "diminish the rights of noncapital defendants." The Court thus follows the lead of the *Strickland* majority in its suggestion that "[f]or purposes of describing counsel's duties," a capital sentencing proceeding "need not be distinguished from an ordinary trial," *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. This approach, however, depreciates the heightened necessity for assuring the reliability of the adversarial process in capital-murder prosecutions and, particularly, in a capital-sentencing trial. The concern with reliability is always paramount in capital cases, but the context for determining reliability in a sentencing trial differs drastically from other kinds of cases:

> "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." [*Woodson v. North Carolina,* 428 *U.S.* 280, 305, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976) (plurality opinion) (footnote omitted).]

As Justice Marshall emphasized in his dissent to *Strickland,* effective assistance of counsel is of singular importance in capital cases, particularly in the sentencing phase, because of the unique challenges entailed in representing a defendant fighting for his very life:

"Reliability" in the imposition of the death sentence can be approximated only if the sentencer is fully informed of "all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas,* 428 *U.S.* 262, 276, 96 *S.Ct.* 2950, 49 *L.Ed.*2d 929 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). The job of amassing that information and presenting it in an organized and persuasive manner to the sentencer is entrusted principally to the defendant's lawyer. The importance to the process of counsel's efforts, combined with the severity and irrevocability of the sanction at stake, require that the standards for determining what constitutes "effective assistance" be applied especially stringently in capital sentencing proceedings.[8] [466 *U.S.* at 715–16, 104 *S.Ct.* at 2079, 80 *L.Ed.*2d at 711–12.]

I believe that the profound difference between capital and non-capital criminal prosecutions compels, as a matter of state constitutional law, the adoption of an enhanced standard by which to measure the competence of counsel and the degree of prejudice sufficient to find a violation of the right to such

---

[8]In the context of a capital sentencing proceeding, Justice Brennan, concurring in *Strickland,* did not disagree with this thought:

Because of their flexibility and the requirement that they be considered in light of the particular circumstances of the case, the standards announced today can and should be applied with concern for the special considerations that must attend review of counsel's performance in a capital sentencing proceeding. In contrast to a case in which a finding of ineffective assistance requires a new trial, a conclusion that counsel was ineffective with respect to only the penalty phase of a capital trial imposes on the State the far lesser burden of reconsideration of the sentence alone. On the other hand, the consequences to the defendant of incompetent assistance at a capital sentencing could not, of course, be greater. Recognizing the unique seriousness of such a proceeding, we have repeatedly emphasized that "'where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'" *Zant v. Stephens,* 462 *U.S.* 862, 874, 103 *S.Ct.* 2733, 77 *L.Ed.*2d 235 (1983) (quoting *Gregg v. Georgia,* 428 *U.S.* at 188–189, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (opinion of Stewart, Powell, and Stevens, JJ.)). [466 *U.S.* at 704, 104 *S.Ct.* at 2073, 80 *L.Ed.*2d at 704.]

assistance. The urgency of this position is accentuated in a case such as this where defendant, in pleading guilty to capital murder, waived his right to a trial on the issue of guilt or innocence through an entry of a plea with serious substantive and procedural shortcomings, see discussion *supra* at 379–382.

In considering an enhanced standard by which to measure the performance of counsel and to determine whether such assistance is effective, we must recognize that counsel representing a defendant in a capital-murder prosecution must demonstrate the competence of a specialist and expert, not simply the skills of an average practitioner. Further, such an attorney must have above-average ability and skill in advocacy and performance to apply in the defense of his client. Such apptitude must include special knowledge, training and experience, and, in a given case, must reflect careful preparation and concentration. These requisites are essential in assuring effective assistance of counsel in a capital-murder prosecution, and most particularly in its sentencing phase. Further, it cannot be overstressed that the demands placed on trial attorneys during a sentencing phase are unique; defense counsel must present to the jury a portrait of the defendant demonstrating his or her worthiness to remain alive. Numerous commentators have pointed out that the crafting of such humanizing presentations requires that defense counsel consult with their clients and pursue exhaustive investigations in order to prepare a psychological defense. *See Burger v. Kemp,* 483 *U.S.* 776, 810, 107 *S.Ct.* 3114, 3134, 97 *L.Ed.*2d 638, 667 (1987) (Blackmun, J., dissenting); *Strickland, supra,* 466 *U.S.* at 717–18, 104 *S.Ct.* at 2080–81, 80 *L.Ed.*2d at 712–13 (Marshall, J., dissenting); *see also* Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 *N.Y.U.L.Rev.* 299 (1983). In light of such demands, the Court can ill-afford to dismiss casually the problem of assessing attorney performance.

The Court also is content to follow the *Strickland/Fritz* test for determining prejudice attributable to ineffective assistance of counsel. The Court, I think, gravely underestimates the

difficulty of identifying and assessing prejudice, particularly with respect to the sentencing trial in a capital-murder prosecution. The degree of prejudice sufficient to warrant finding a violation of the right to effective assistance of counsel is, even in the guilt phase of a capital trial, essentially inscrutable. As observed by Justice Marshall in *Strickland*, "seemingly impregnable cases can sometimes be dismantled by good defense counsel. On the basis of a cold record, it may be impossible for a reviewing court confidently to ascertain how the government's evidence and argument would have stood up against rebuttals and cross-examination by a shrewd, well-prepared lawyer." 466 *U.S.* at 710, 104 *S.Ct.* at 2076, 80 *L.Ed.*2d at 708. Indeed, the "evidence of injury to the defendant may be missing from the record precisely because of the incompetence of defense counsel." *Ibid.*

The prejudice standard adopted by the Court is so difficult to apply that it borders on the illusory. Our Court has already shown a proclivity to minimize prejudice by resorting to a superseding test premised on overwhelming-evidence-of-guilt. *See, e.g., Pitts, supra,* 116 *N.J.* at 619–20 (defendant was not prejudiced by the court's failure to charge jury on serious-bodily-injury murder because of the overwhelming evidence of defendant's guilt of knowing murder); *Hunt, supra,* 115 *N.J.* at 376 (noting that only in the most tenuous sense would the evidence have supported a serious-bodily-injury murder charge due to the overwhelming evidence that defendant knowingly murdered his victim; thus defendant was not prejudiced by court's failure to give a *Gerald* charge); *Rose, supra,* 112 *N.J.* at 489 (where evidence of defendant's guilt was overwhelming in murder prosecution, admission of testimony concerning defendant's reason for purchasing shotgun used to fatally shoot officer was harmless error, despite its capability to prejudice jury and its limited relevance).

Thus, under the Court's standard of appellate review, a manifestly guilty defendant will find it almost impossible to

demonstrate prejudice sufficient to constitute reversible error. *Ibid.* It may be equally impossible for a manifestly guilty defendant to be able to show that he received an unfair trial through ineffective assistance of counsel. Does this then imply that a manifestly guilty defendant is not truly entitled to a fair trial effectively assisted by competent counsel? I do not think the Court today furnishes an effective rebuttal to the parallel concern articulated by Justice Marshall in *Strickland:*

> the assumption on which this Court's holding rests is that the only purpose of the constitutional guarantee of effective assistance of counsel is to reduce the chance that innocent persons will be convicted. In my view, the guarantee also functions to ensure that convictions are obtained only through fundamentally fair procedures. The majority contends that the Sixth Amendment is not violated when a manifestly guilty defendant is convicted after a trial in which he was represented by a manifestly ineffective attorney. I cannot agree. Every defendant is entitled to a trial in which his interests are vigorously and conscientiously advocated by an able lawyer. A proceeding in which the defendant does not receive meaningful assistance in meeting the forces of the State does not, in my opinion, constitute due process. [466 *U.S.* at 711, 104 *S.Ct.* at 2077, 80 *L.Ed.*2d at 708 (Marshall, J., dissenting).]

The operative standard for prejudice adopted by the Court is whether a "different result" would obtain if defendant had effective assistance of counsel. The majority, however, is almost blase about the difficulty of estimating the likelihood of a different result in a capital case, particularly with respect to the penalty phase. In determining the propriety of life or death, the jury's function is essentially normative rather than evaluative. *See, e.g., Pitts, supra,* 116 *N.J.* at 623–25 (Handler, J., dissenting); Gabriel, "The Strickland Standard for Claims of Ineffective Assistance of Counsel: Emasculating the Sixth Amendment in the Guise of Due Process," 134 *U.Pa.L.Rev.* 1259, 1266–72 (1986); Genego, "The Future of Effective Assistance of Counsel: Performance Standards and Competent Representation," 22 *Amer.Crim.L.Rev.* 181–212 (1984). Thus, the test of both a lawyer's competence and failings takes on different meaning in this kind of trial, a sentencing trial in which the outcome is either life or death. As one scholar explained:

the capital defendant's lawyer has an obligation to advocate a life sentence. The Court's stress on reliability, even interpreted simply as the lack of a causal relationship between counsel's deficient performance and the death sentence, in no way links the attorney's duty to the "cure" for its breach.... [O]ne can hardly begin to guess what arguably mitigating factors, if presented to the sentencer, might have convinced it to show leniency. [Berger, "The Supreme Court and Defense Counsel? Old Roads, New Paths—A Dead End?," 86 *Col.L.Rev.* 9, 95 n. 443 (1986).]

These objections seem to me meritorious; the Supreme Court's conclusion, seemingly adopted by our Court today—that there is no need to distinguish sentencing phases of capital cases from ordinary trials because the penalty phase is conducted like a trial—fails to take into account that the focus of both defense counsel's efforts and the sentencer's deliberations in a capital-sentencing proceeding differs radically from an ordinary trial. The capital sentencer is not primarily finding facts but weighing and comparing them. *See, e.g., Rose,* 112 *N.J.* at 573–77 (Handler, J., dissenting). The judgment of the sentencing jury, though guided, is thus highly subjective. It seems clear, moreover, that as a judgment becomes more subjective, the task of assessing the extent to which that judgment might have been influenced by more competent representation becomes more difficult. Tying the effectiveness of representation to the "reliability" of a result thus seems quixotic when one's assessment of that "reliability" cannot itself be made with any degree of "reliability."

I do not think that these fears attending the standards adopted by the Court for effective assistance of counsel—a sliding scale for measuring performance and a test of prejudice that evaluates its gravity in inverse proportion to the evidence of guilt—are groundless. The case law to emerge since *Strickland* sheds doubt on whether the flexible and amorphous *Strickland* standards are as protective as the Court believes. This experience is particularly germane to this case in which a defendant, on his lawyer's advice, is exposed only to a sentencing trial in which his depravity is a dominant issue and the

adequacy of professional preparations relating to his own defense was highly problematic.

In the wake of *Strickland,* several federal courts have held that the failure of counsel to investigate and present mitigating evidence constituted ineffective assistance of counsel. *See Jones v. Thigpen,* 788 *F.*2d 1101, 1103 (5th Cir.1986) (defense counsel presented no mitigating evidence at all, despite fact that defendant was mentally retarded, seventeen years of age at the time of the crime, and "was not proved to have had any intent or role in the homicide"), *cert.* den., 479 *U.S.* 1087, 107 *S.Ct.* 1292, 94 *L.Ed.*2d 148 (1987); *Thomas v. Kemp,* 796 *F.*2d 1322, 1324–25 (11th Cir.) (defendant's lawyer made no effort to investigate possible sources of mitigating evidence beyond interviewing defendant's mother; thus, in light of post-trial evidence that several people would have testified if called, "[i]t cannot be said that there is no reasonable probability that the results of the sentencing phase of the trial would have been different if mitigation evidence had been presented"), *cert.* den., 479 *U.S.* 996, 107 *S.Ct.* 602, 93 *L.Ed.*2d 601 (1986); *Blake v. Kemp,* 758 *F.*2d 523, 533 (11th Cir.) (defendant's sentence prejudiced by failure of counsel to make any preparation whatsoever "because he believed that [defendant] would be found not guilty by reason of insanity," and where there were character witnesses who could have testified), *cert.* den., 474 *U.S.* 998, 106 *S.Ct.* 374, 88 *L.Ed.*2d 367 (1985); *Tyler v. Kemp,* 755 *F.*2d 741 (11th Cir.1985) (defendant denied effective assistance of counsel during sentencing phase where defense counsel presented no evidence of mitigating circumstances although defendant had no prior criminal record, a good work record, and family members and employer would and could have testified as to mitigating facts), *cert.* den., 474 *U.S.* 1026, 106 *S.Ct.* 582, 88 *L.Ed.*2d 564 (1985) overruled on other grounds *sub nom. Peek v. Kemp,* 784 *F.*2d 1479, 1494 (11th Cir.), *cert.* den., 479 *U.S.* 939, 107 *S.Ct.* 421, 93 *L.Ed.*2d 371 (1986).

Other courts, however, in arguably indistinguishable contexts, have taken a more restrictive view of the *Strickland*

test, particularly its prejudice element. The court in *Dobbs v. Kemp*, 790 *F.*2d 1499, 1513 (11th Cir.1986), *cert.* den., 481 *U.S.* 1059, 107 *S.Ct.* 2203, 95 *L.Ed.*2d 858 (1987), modified on other grounds, 809 *F.*2d 750 (11th Cir.1987), concluded that counsel's investigation was "reasonably substantial" and the failure to present mitigating evidence was a reasonable tactical decision. In *Whitley v. Bair*, 802 *F.*2d 1487 (1986), *cert.* den., 480 *U.S.* 951, 107 *S.Ct.* 1618, 94 *L.Ed.*2d 802 (1987), the Fourth Circuit denied relief despite defense counsel's failure to investigate mitigating circumstances, leaving him ignorant of evidence of (1) defendant's heavy drinking in the weeks preceding the crime, (2) "the tragic circumstances of [defendant's] childhood, and (3) defendant's organic brain dysfunction and "antisocial personality disorder." *Id.* at 1492. In determining that "negative aspects" of the evidence would have outweighed its mitigating effect, the court reached a conclusion reminiscent of the weighing of evidence that our own Court has now endorsed on appellate review for other kinds of trial error. *See, e.g., Pitts, supra,* 116 *N.J.* at 614–20; *Hunt, supra,* 115 *N.J.* at 376. In *Glass v. Blackburn,* 791 *F.*2d 1165, 1170–71 (5th Cir.1986), *cert.* den., 481 *U.S.* 1042, 107 *S.Ct.* 1985, 95 *L.Ed.*2d 824 (1987), the court held that there was no prejudice in failing to present evidence in the penalty phase of a capital case despite affidavits of friends and neighbors who indicated their willingness to testify and of trial counsel who stated that failure to call witnesses "was not the result of a strategic choice but was, rather, the result of mental and physical fatigue at the conclusion of the guilt phase." *Id.* at 1170. The court was not persuaded of the likelihood that the jury would have rendered a different verdict. Again, the court relied on the circumstances of the crime, execution-style murder.

In *Burger v. Kemp, supra,* 483 *U.S.* 776, 107 *S.Ct.* 3114, 97 *L.Ed.*2d 638, the Supreme Court splashed headlong into this muddy water and roiled it even more, holding 5–to–4 that a defendant was not denied effective assistance of counsel de-

spite the failure of counsel to offer mitigating evidence during the penalty phase. Defendant was seventeen at the time of the incident; a psychologist testified at the suppression hearing that defendant had an IQ of eighty-two and functioned at the level of a twelve-year old child. 483 *U.S.* at 779–80, 107 *S.Ct.* at 3118, 97 *L.Ed.*2d at 648. Defense counsel, however, presented no mitigating evidence. On appeal, defendant claimed that his counsel's performance had been deficient because he had failed to conduct an adequate investigation of possible mitigating circumstances and had no valid strategic explanation of his failure to offer any mitigating evidence. Nonetheless, the Court concluded, a more thorough investigation would have been unhelpful because the evidence produced by such an investigation "could have affected the jury adversely by introducing facts not disclosed by petitioner's clean adult criminal record." 483 *U.S.* at 793, 107 *S.Ct.* at 3125, 97 *L.Ed.*2d at 656. While the Court conceded that such an investigation could have been made, it stated that " '[w]e address not what is appropriate, but only what is constitutionally compelled.' " 483 *U.S.* at 794, 107 *S.Ct.* at 3126, 97 *L.Ed.*2d at 657, quoting *United States v. Cronic, supra,* 466 *U.S.* at 655 n. 38, 104 *S.Ct.* at 2050 n. 38, 80 *L.Ed.*2d at 672 n. 38. It noted, further, that counsel had interviewed "all potential witnesses who had been called to his attention"; "there was," therefore, "a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty." 483 *U.S.* at 795, 107 *S.Ct.* at 3126, 97 *L.Ed.*2d at 657.

Justices Blackmun and Powell, joined by Justices Marshall and Brennan, dissented. Justice Blackmun would have vacated the death sentence. He stressed "the force of such evidence [of a seriously disturbed childhood] in a decision whether an individual should be sentenced to die," and concluded that the failure to produce this evidence was not explained "by reasonable professional judgments." 483 *U.S.* at 817, 107 *S.Ct.* at 3137, 97 *L.Ed.*2d at 671. Justice Powell, also mindful of the youth of the defendant, his low IQ, and the fact that defendant

"possibly had suffered brain damage from beatings when he was younger," 483 *U.S.* at 818, 107 *S.Ct.* at 3138, 97 *L.Ed.*2d at 672, observed:

> Where information at the sentencing stage in a capital case may be highly relevant, counsel's burden of justifying a failure to investigate or present it is similarly heightened. There is no indication that counsel understood the relevance, much less the extraordinary importance, of the acts of Burger's mental and emotional immaturity, and his character and background, that were not investigated or presented in this case. This evidence bears directly on Burger's culpability and responsibility for the murder and in fact directly supports the strategy counsel claimed to have deemed best—to emphasize the difference in criminal responsibility between the two participants in the crime. Absent an explanation that does not appear in this record, counsel's decision not to introduce—or even to discover—this mitigating evidence is unreasonable, and his performance constitutionally deficient. [483 *U.S.* at 822, 107 *S.Ct.* at 3140, 97 *L.Ed.*2d at 674-75 (Powell, J., dissenting) (footnote omitted).]

*Burger v. Kemp* does not bode well for the *Strickland* standard. The *Burger* majority may be said to have clarified the standards by focusing on the competency prong rather than on the prejudice prong. By essentially holding that defense counsel's failure to investigate further the existence of mitigating evidence was a reasonably competent decision, it is arguable that the Court avoided the difficult judgment, which has divided lower courts, of whether that failure prejudiced the defendant. However, what is problematic about this view of *Burger's* rendition of the *Strickland* standard is that the Court's analysis belies it; the Court concluded that the defense counsel's failure was reasonably competent precisely because the Court decided that the failure could not have prejudiced defendant's case. It exposes the fallacy of a free-floating standard of competency and a guilt-ladened standard of prejudice.

Again, we are confronted with federal law that pulls conflictingly in different directions. The standard we adopt is not unlike the unanchored standard that we chose for appellate review in capital cases, *see, e.g., State v. Bey (I)*, 112 *N.J.* 45, 91–95 (1988). It is doubtful that it will often reach the heightened level of protection that is the high-water mark of capital

prosecutions or will not, as often, be weighted down by heavy evidence of the defendant's guilt.

In sum, I believe the profound difference between capital and noncapital criminal prosecutions compels, as a matter of state constitutional law, the adoption of an enhanced standard by which to measure the competence of counsel and the degree of prejudice sufficient to find a violation of the right to such assistance. We must recognize that counsel representing a defendant in a capital-murder prosecution must demonstrate the competence of a specialist and expert, not simply the skills of an average practitioner. Most particularly, counsel should exhibit this level of competence in the sentencing phase of a capital murder prosecution. Further, prejudice attributable to ineffective assistance of counsel as a basis for reversal should be viewed realistically, fairly, and tolerantly. This is particularly so in the sentencing phase of the trial. Such prejudice should be presumed when counsel's inadequacy relates to the factors that a jury must consider not only in determining the existence of facts but also in weighing their comparative worth in terms of whether the defendant should live or die.

The consequence of this standard, as applied to this case, is that defense counsel's failure to consult more extensively with his client or to pursue a psychological defense violated minimum standards of professional competence; the prejudice deriving from this violation in terms of the inherent reliability of the determination of the death sentence should be presumed.

## IV.

For the reasons expressed, I would reverse defendant's conviction of capital murder and sentence of death.

GARIBALDI, J., dissenting in part and concurring in part.

Defendant pled guilty to the savage murder of Barbara Blomberg, a twenty-three-year-old woman. The plea was taken

before our decision in *State v. Gerald,* 113 *N.J.* 40 (1988), was published. Therefore, we must determine whether there is a sufficient factual basis in support of the plea to establish that defendant intentionally murdered Ms. Blomberg. In Part 2E of its opinion, the majority concludes that there is an insufficient factual basis to establish that defendant knowingly intended to cause her death. *Ante* at 374 (1989). Thus, it concludes that defendant is not death-eligible. *Id.* at 375. I disagree. I find that the evidence overwhelmingly demonstrates that defendant killed deliberately.

By pleading guilty to murder, defendant hoped to avoid the death penalty. In order to establish a sufficient factual basis for his murder plea, defendant urged and the trial court agreed to admit into evidence a signed, sworn confession that he gave to the police. After reviewing the confession and admitting it into evidence, the trial court accepted the murder plea, finding that defendant had sufficiently acknowledged facts constituting the essential elements of the crime to which he was pleading guilty, *State v. Sainz,* 107 *N.J.* 283, 293 (1987)—the murder of Barbara Blomberg.

Defendant's confession provides compelling evidence that defendant intended to kill. The following portion of defendant's confession speaks for itself:

Q. What did you do when you got to Barbara's house?

A. I drove up in my car and parked in her driveway in front of her car. I got out, rang the bell and nobody answered. I went into the pantry room. I tried breaking in with my knife but I couldnt get in so I went out to my car and got a screwdriver from my toolbox in the trunk of the car. With the screwdriver I pried open the molding on the door frame and it left a half inch gap and that gave me room to open the door with my knife.

Q. What does the knife look like?

A. It has a black handle, locking blade and the blade is 4 or 5 inches long.

Q. *What did you do when you got inside?*

A. *I looked around the kitchen and found the cord.*

Q. What did the cord look like or what color was it?

A. I dont remember. I had been drinking.

Q. After you got the cord what did you do?

A. I put it around my neck and I walked up the steps. When I got to the top of the steps and into the bedroom she asked "Who is it" a couple times. *Then I jumped on the bed, didn't say anything, I wrapped the cord around her neck. I choked her with the cord for at least a couple of minutes. Im not sure how long. Then I took the screwdriver and I stabbed her once in the back, Im not sure how many times. I then took my knife and stabbed her in the neck, throat, and in the back somewhere. In the side a couple times.*

Q. Earlier you told us about a telephone in the room, what did you say about it?

A. *When I got on the bed I wrapped the cord around her neck and she grabbed the phone and tried to call for help or hit me with it I dont remember. I cut the cord.*

Q. When you went in the house what lights were on?

A. Some light in the kitchen.

Q. Did you turn on any lights in the house after you got in anywhere before you later left?

A. No.

Q. What did you do after you stabbed Barbara?

A. I think I had a towel in my hand that I took with me. Then I went down the steps into the kitchen, cut the phone cord and took the phone.

 \* \* \* \* \* \* \* \*

Q. What did you do after you left the house?

A. I got in my car, I put it in neutral and rolled it out of the driveway without starting it. I started it after I got it out in the street. I drove across the street from her house and went across the black top and into a field. Thats where I opened up the car door and threw away the rag and the phone. There is a dagger I took, I forgot. Its brass like letter opener or paperweight. I think I threw that there too.

Q. What did you do with the knife you stabbed Barbara with?

A. I washed it off in the kitchen and kept it. I think I threw it away in a field in Pennsylvania. [Emphasis added]

The Court acknowledges that "there may be sufficient facts available to support a finding that the defendant knowingly and purposefully murdered." *Ante* at 371. Nonetheless, relying exclusively on the following exchange at the plea hearing between the defense attorney and defendant, it concludes that there is an insufficient basis to find that defendant intended to kill his victim deliberately:

Q: Did you *go into that apartment* with the idea or intention to kill her?

A: No.

[Emphasis added]

Plainly read, this brief exchange does not "contradict" the overwhelming evidence that defendant intended to kill Blomberg. It merely suggests that he did not plan to kill her *before* he entered her apartment. It bears no relevance to the important question of whether he formed such an intent *after* he broke into the apartment. In view of overwhelming evidence to the contrary, it is difficult to understand the majority's position that there is an insufficient factual basis to find that defendant killed Barbara Blomberg intentionally and deliberately. Defendant's very decision to plead guilty to a crime for which he understood that he could be sentenced only to death or to a minimum thirty year term without parole under *N.J.S.A.* 2C:11–3 suggests otherwise.

More importantly, defendant's confession demonstrates clearly that he intended to kill. After entering the victim's home, defendant immediately proceeded to the kitchen in search of an electrical appliance cord. He quickly found his weapon, the appliance cord from a coffee maker. With premeditated calm, he placed the cord around his neck as he walked up the stairs towards the victim's bedroom. On reaching the top of the stairs, defendant pounced violently on Blomberg as she lay in bed. He wrapped the cord tightly around her neck and began strangling her. Defendant kept the cord pressed around her neck for several minutes. Struggling desperately to save her life, Blomberg attempted to grab the telephone. Defendant cut the telephone line. He then proceeded to stab her savagely in various parts of the body with a knife and a screwdriver.[1]

---

[1]The autopsy report reveals that the victim was stabbed forty-nine times in various positions and at varied depths. Thirty-five of the stab wounds were in the area of vital organs—the neck, liver and heart. According to the autopsy report, death resulted from ligature strangulation—consistent with strangulation by an electric appliance cord. The medical examiner estimated that the killer kept the cord around the victim's neck for three to seven minutes.

Blomberg's mutilated and bloodied body was discovered two days later. An electrical appliance cord was found wrapped around her neck. One does not strangle someone for several minutes with an electrical appliance cord if one intends merely to injure.

Today's decision is especially incomprehensible in light of our recent decision in *State v. Pitts*, 116 *N.J.* 580 (1989). In *Pitts* a jury sentenced the defendant to death for the murder of Stacey Elizardo. Because the trial occurred before *Gerald, supra,* was decided, the jury was not instructed to consider whether the defendant purposely or knowingly caused death. Nevertheless, we determined that based on the evidence in the record, "it would be virtually inconceivable that a jury could have concluded that defendant intended to cause serious bodily injury to Elizardo, but not death." *Pitts, ante* 116 *N.J.* 580, 620.

Likewise, had defendant in the instant case been convicted of murder by a jury and sentenced to death, I have no doubt that we would find based on the evidence that it would be virtually "inconceivable" that the jury could have concluded that defendant intended merely to cause bodily harm. Similarly, I find it virtually "inconceivable" that based on the evidence in support of the plea the trial court in this case could have concluded that defendant intended merely to cause bodily harm to Barbara Blomberg. To reward defendant merely because he chose to plead guilty to murder rather than stand trial, as the Court does today, seems inconsistent and unwise. I respectfully dissent.

*For vacation and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN and STEIN—5.

*Concurring in part; dissenting in part*—Justices HANDLER and GARIBALDI—2.